[928 NYS2d 515]

CORA CAHAN GERSTEN et al., Appellants, v 56 7TH AVENUE LLC et al., Respondents, et al., Defendants.

First Department, August 18, 2011

190

## APPEARANCES OF COUNSEL

*Himmelstein, McConnell, Gribben, Donoghue & Joseph*, New York City (*William J. Gribben* and *Ronald S. Languedoc* of counsel), for appellants.

*Belkin Burden Wenig & Goldman, LLP*, New York City (*Magda L. Cruz* of counsel), for respondents.

### OPINION OF THE COURT

RENWICK, J.

The Court of Appeals recently rendered a decision with significant ramifications for the real estate industry in New York City. In affirming this Court's decision in *Roberts v Tishman Speyer Props., L.P.* (13 NY3d 270 [2009], *affg* 62 AD3d 71 [2009], *revg* 2007 NY Slip Op 32639[U] [2007]), the Court held that thousands of unregulated "market" apartments, at two Manhattan building complexes (Stuyvesant Town and Peter Cooper Village), were improperly removed from rent stabilization while the owners, Tishman Speyer and MetLife, received benefits under the City's J-51 tax abatement and exemption program.[1] The Court agreed with our statutory interpretation, thereby rejecting the Division of Housing and Community Renewal's (DHCR) regulation, which interpreted the luxury decontrol statute[2] as permitting deregulation of rent-stabilized apartments in

---

**1.** Under Administrative Code of the City of New York § 11-243 (previously § J51-2.5), landlords receive tax benefits to offset the costs of renovations. Pursuant to the J-51 program, a landlord's receipt of tax benefits is conditioned on maintaining apartments as rent-stabilized (*see* 28 RCNY 5-03 [f]).

**2.** The Rent Stabilization Law of 1969 (RSL) provides for deregulation when the rent for a vacant apartment reaches $2,000 (vacancy deregulation) or when the household income is $175,000 or more for two consecutive years and the legal regulated rent is $2,000 or more (high-income rent deregulation) (*see* RSL [Administrative Code] §§ 26-504.1, 26-504.2).

buildings receiving J-51 benefits provided the building was already subject to rent regulation before the receipt of such benefits.

The ramifications of *Roberts*, however, remain uncertain; the case left unresolved a number of issues, including those explicitly noted by the Court: "retroactivity, class certification, the statute of limitations, and other defenses that may be applicable to particular tenants" (13 NY3d at 287). In this unrelated case, we are faced with some of these issues. They arise in a dispute between cotenants and a building owner. The owner took over the subject property in 2009, a decade after the former owner had deregulated the apartment pursuant to a 1999 DHCR luxury decontrol order. Plaintiffs, who are not the typical tenants intended to be protected by rent regulation, commenced this action seeking a declaration that the 1999 DHCR luxury decontrol order is void ab initio pursuant to *Roberts*. The answer depends on whether *Roberts* should be applied retroactively, and if so, whether the defense of statute of limitations or administrative finality may be invoked to give preclusive effect to the 1999 DHCR luxury decontrol order.

### Factual and Procedural Background

The pertinent facts are essentially undisputed. Plaintiffs have lived on the 20th floor of a West Village apartment building since 1968. The first apartment they rented, 20H, was then rent-controlled. Eleven years later, in 1979, plaintiffs rented an adjacent apartment, 20J, under a rent-stabilized lease. For 16 years, from 1979 to 1995, they occupied both apartments, and, in the 1980s, they combined the two apartments into one unit. In 1995, plaintiffs rented a third apartment, 20A, under another rent-stabilized lease. With the owner's consent, they combined all three apartments into one, creating an apartment that took up the building's entire 20th floor. The 20th floor apartment is 3,259 square feet in size, and contains four bedrooms, five bathrooms, an office, an eat-in kitchen, separate dining room, and a 20-foot-by-34-foot living room. The combined rent for the apartment, under all three leases, was more than $2,000 per month.

In 1990, the building's prior owner began to receive J-51 tax benefits, which were to last 20 years. Such benefits officially remained in effect until June 30, 2009. In 1998, the building's prior owner filed a luxury deregulation petition with DHCR with respect to the combined 20th floor apartment. On the

income certification form that the predecessor owner sent plaintiffs, plaintiffs acknowledged that the collective rent for the combined 20th floor apartment was more than $2,000 per month, and that their annual household income was more than $175,000 for each of the two years preceding the petition. As noted above, at the time of the filing of the petition, the prior owner was receiving J-51 tax benefits.

In September 1999, DHCR issued an order deregulating the combined 20th floor apartment. Accordingly, once the rent-regulation terms of each of the three leases and the rental agreement expired, the 20th floor apartment became deregulated based on the DHCR decontrol order finding that the collective legal regulated rent exceeded $2,000 per month, and that the tenants' income exceeded the statutory threshold (RSL [Administrative Code] § 26-504.3 [c] [2]). Notably, plaintiffs never appealed the DHCR decontrol order through an administrative appeal; nor did they commence a CPLR article 78 proceeding.

On September 30, 1999, plaintiffs and the predecessor owner entered into a four-year lease for the 20th floor apartment. The initial rent was $5,000 per month, for a term ending on November 30, 2003. In September 2002, near the expiration of the four-year lease, plaintiffs and the predecessor owner negotiated terms for an extension of the lease; this next lease was for a nine-year term, beginning on December 1, 2003 and ending on November 30, 2012, with an initial rent of $6,000 per month.

In January 2008, defendant 56 7th Avenue LLC acquired the building, and defendant Northbrook Management LLC became the new managing agent (hereinafter defendants). When the new owner bought the building, no tax benefits under the J-51 program were in effect, and the new owner has never applied for any J-51 tax benefits.

In December 2009, after the Court of Appeals issued *Roberts*, plaintiffs commenced this action, seeking a declaration that the 1999 DHCR luxury deregulation order was invalid and demanding reimbursement for alleged rent overcharges for the past 11 years. Plaintiffs claimed that their lease should be rescinded, and that in its place, defendants should give them a new rent-stabilized lease. Plaintiffs claimed that because the building was receiving J-51 tax benefits in 1999, the predecessor owner was not entitled to deregulate the 20th floor apartment.

On July 15, 2010, Supreme Court granted defendants' motion to dismiss the action. The court held that DHCR's deregulation order was binding and that the court had no jurisdiction to set

it aside 11 years after its issuance. The court stated, "Despite the decision in *Roberts* this court is without jurisdiction to grant [the] declaratory relief as the statute of limitations for Article 78 proceedings has expired and the court must respect the decision of DHCR in this type of proceeding." This appeal ensued.

## Interplay of J-51 Benefits and the RSL

To place this matter within its proper context, we must first examine the interplay of J-51 benefits and the RSL. The City's J-51 tax incentive program allows property owners who complete qualifying multiple dwelling improvements to receive tax exemptions and abatements for a period of years. In exchange for receiving such benefits, the landlords subject their properties to the RSL (Administrative Code § 11-243). Accordingly, units not otherwise subject to rent stabilization become rent-stabilized.

For example, section 5 (a) (5) of the Emergency Tenant Protection Act of 1974 (McKinney's Uncons Laws of NY § 8625 [a] [5] [as added by L 1974, ch 576, sec 4, § 5, as amended]) exempts from stabilization "housing accommodations in buildings completed or buildings substantially rehabilitated as family units on or after" January 1, 1974. A building that has been completely renovated for residential use after December 31, 1973, is therefore exempt from stabilization coverage (*see e.g. Wilson v One Ten Duane St. Realty Co.*, 123 AD2d 198, 201 [1987]). Where an owner, however, receives J-51 benefits in connection with such a renovation, the building will indeed be rent-stabilized, for a period of time, by virtue of RSL (Administrative Code) § 26-504 (c), which covers "[d]welling units in a building or structure receiving the benefits of section 11-243." (*See e.g. Matter of Eastern Pork Prods. Co. v New York State Div. of Hous. & Community Renewal*, 187 AD2d 320 [1992].)

Where the building only became subject to rent regulation due to its participation in the J-51 program, RSL (Administrative Code) § 26-504 (c) expressly provides that once the tax benefits terminate, the units may be deregulated in one of two ways. One way is for the owner to include a J-51 rider in the lease informing the occupant that the apartment will be deregulated upon the termination of the benefit (*id.*; Rent Stabilization Code [RSC] [9 NYCRR] § 2520.11 [o]). If the lease does not contain the requisite notice, occupied units remain subject to rent stabilization until a vacancy occurs after the expiration of the J-51 benefits (*see East W. Renovating Co. v*

*New York State Div. of Hous. & Community Renewal,* 16 AD3d 166 [2005]; *Matter of Lomagno v Division of Hous. & Community Renewal,* 38 AD3d 897 [2007]).

Owners of rent-regulated buildings also frequently apply for and receive J-51 benefits for such routine work as boiler installations, new windows, elevator upgrades and the like. The receipt of J-51 benefits under such circumstances has no effect on the building's rent-regulated status. That is, a rent-stabilized building will be rent-stabilized before, during and after the receipt of J-51 benefits. This much was clear before *Roberts*.

What was unclear before *Roberts was* whether individual rent-stabilized units may be subject to high-rent/high-income deregulation in buildings receiving J-51 benefits. In 1993, the Legislature enacted the Rent Regulation Reform Act (RRRA [as added by L 1993, ch 253]), which provided for the luxury decontrol or deregulation of rent-stabilized apartments if the regulated monthly rent was at least $2,000 and the apartments were either vacant or occupied by occupants with a combined annual income of more than $250,000 (RSL [Administrative Code] former § 26-504.3). The income threshold was later lowered to $175,000 (RSL [Administrative Code] § 26-504.1). The RRRA, however, also provided that luxury decontrol would not apply to units which "became or become" subject to·rent stabilization "by virtue of receiving" J-51 tax benefits (RSL [Administrative Code] §§ 26-504.1, 26-504.2 [a]).

In 1996, DHCR issued an advisory opinion that participation in the J-51 program precluded luxury decontrol *only* where the receipt of J-51 benefits was the *sole reason* for the imposition of rent regulation (*Roberts*, 13 NY3d at 281). In 2000, DHCR incorporated that position into the Rent Stabilization Code, stating that luxury decontrol shall not apply to housing units which "became or become" subject to rent stabilization *"solely by virtue of the receipt"* of J-51 tax benefits (*id.* at 281-282 [internal quotation marks omitted]).

At some point after the enactment of the RRRA, according to *Roberts*, MetLife began charging market-rate rents in units in the Stuyvesant Town and Peter Cooper Village properties where the conditions for high-rent/high-income luxury decontrol were met (*id.* at 282). In January 2007, nine individuals residing in these apartment complexes sued MetLife on behalf of a putative class of all current and former tenants who were, or would be, charged rents exceeding the rent-stabilization limits for any period during which the landlord received J-51 benefits (*id.*). The

plaintiffs sought a declaration that units in the properties would remain rent-stabilized as long as J-51 benefits were received, along with rental overcharges totaling $215 million and attorneys' fees (*id.*).

Supreme Court dismissed the complaint, agreeing with DHCR's position that the exception to luxury decontrol did not apply because the properties "did not become subject to rent stabilization by virtue of receiving" J-51 benefits (2007 NY Slip Op 32639[U], *11). This Court, however, reversed and reinstated the complaint, concluding that owners who receive J-51 benefits forfeit their luxury decontrol rights even if their buildings were already subject to the RSL (62 AD3d 71 [2009]). On appeal, the Court of Appeals affirmed, reasoning "that [DHCR's] interpretation of the exception to luxury decontrol for units that 'became or become' subject to rent stabilization 'by virtue of receiving' J-51 benefits conflicts with the most natural reading of the statute's language" (13 NY3d at 286). Such an interpretation, the Court explained, would essentially recognize two categories of J-51 buildings—those that were already rent-stabilized and those that "became rent-stabilized as a condition of receiving J-51 benefits" (*id.*). "But there is no language anywhere in the statute delineating these two supposed categories, and we see no indication that the Legislature ever intended such a distinction," the Court said (*id.*). Moreover, turning to the legislative history, the Court pointed to the RRRA's sponsor's statement that "at no point" would luxury decontrol be available to buildings receiving J-51 tax benefits (*id.*).

## Discussion

On this appeal, plaintiffs argue—and defendants do not dispute—that the 20th floor apartment was deregulated in 1999, while the predecessor owner was still receiving J-51 benefits. According to plaintiffs, under *Roberts*, that deregulation was actually illegal. Thus, plaintiffs argue, the DHCR order is void ab initio.

A. Retroactivity

■ Defendants, however, urge this Court to apply *Roberts* prospectively only, which we decline to do. In the seminal case of *Gurnee v Aetna Life & Cas. Co.* (55 NY2d 184 [1982], *cert denied* 459 US 837 [1982]), the Court of Appeals adopted the three-pronged test announced by the U.S. Supreme Court in *Chevron Oil Co. v Huson* (404 US 97 [1971]), for determining whether a ruling should be applied prospectively only. " 'First,

the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed' " (55 NY2d at 192, quoting *Chevron Oil Co.*, 404 US at 106). Second, a court should consider the prior history of the rule and examine the impact of retroactive application on the rule's purpose (*id.*). Third, any inequity that would result from retroactive application should be considered (*id.*).

The facts of *Roberts* do not satisfy even the first prong of the *Gurnee* three-prong analysis. Courts have consistently held that judicial statutory construction does not create a new principle of law (*see e.g. Gurnee v Aetna Life & Cas. Co.*, 55 NY2d 184, 192 [1982]; *Ramirez v Mansions Catering, Inc.*, 74 AD3d 490, 492 [2010]). For example, in *Gurnee*, the Court of Appeals held that its decision in *Kurcsics v Merchants Mut. Ins. Co.* (49 NY2d 451 [1980]), construing Insurance Law § 671, should apply to pending cases (55 NY2d at 194). Insurance Law § 671 provided that a person injured in a car accident could recover first-party benefits of 80% of lost salary to a maximum of $1,000. In *Kurcsics,* the Superintendent of Insurance's reading of the statute was that recovery was limited to $800, 80% of a maximum of $1,000 (49 NY2d at 458-459). The Court of Appeals disagreed, holding that the language of the statute permitted recoveries of up to $1,000 if that amount represented 80% of an injured person's lost salary (*id.* at 458).

The *Gurnee* Court explained that *Kurcsics* did not represent an "abrupt shift" in controlling case law; it merely represented the Court's first opportunity to interpret the language of the statute (*Gurnee*, 55 NY2d at 191). Noting that the State Insurance Department had adopted regulations taking a contrary view to the one it adopted in *Kurcsics*, the Court stated that a decision construing statutory language "does not constitute the creation of a new legal principle" (*id.* at 192). Finally, the Court found that "the definitional language of section 671 itself foreshadowed the conclusion this court first had the opportunity to express in *Kurcsics*" (*id.*).

The facts of *Roberts* are indistinguishable from *Gurnee*. Although *Roberts*'s interpretation of the statute is inconsistent with regulations promulgated by DHCR, the Court has not enunciated a new principle of law. Instead, as in *Gurnee,* the decision in *Roberts* was based on a pure statutory analysis, "dependent only on [an] accurate apprehension of legislative

intent" (*Roberts*, 13 NY3d at 285, quoting *Kurcsics*, 49 NY2d at 459). As such, *Roberts* did not establish a new legal principle, but rather "merely construed a statute that had been in effect for a number of years" (*Gurnee*, 55 NY2d at 192).

Since no "new rule" was pronounced in *Roberts*, *Gurnee* mandates that *Roberts* must be applied retroactively (*see 72A Realty Assoc. v Lucas*, 28 Misc 3d 585, 589 [Civ Ct, NY County 2010], *mod on other grounds* 32 Misc 3d 47, 49 [App Term, 1st Dept 2011] [holding that *Roberts* must be applied retroactively because "(a) judicial decision construing the words of a statute . . . does not constitute the creation of a new legal principle" (quoting *Gurnee*, 55 NY2d at 192)]). Nor has defendant presented any basis here for disturbing the presumption that the *Roberts* holding be accorded retroactive effect (*see People v Favor*, 82 NY2d 254, 262-263 [1993]). On the contrary, as in *Gurnee*, the ruling in *Roberts* was clearly foreshadowed in view of the clear language of the statute. Moreover, the equities do not favor only prospective application of *Roberts*. The impact of retroactive application of *Roberts* would be to protect, where applicable, tenants from rent increases in excess of those allowed by the RSL. A contrary ruling would essentially allow landlords throughout the City to collect rents in excess of those allowed by the RSL based upon a faulty statutory interpretation.

B. Statute of Limitations

Alternatively, defendants argue that under statute of limitations principles this Court must still grant preclusive effect to the 1999 DHCR luxury decontrol order. Specifically, defendants argue that a challenge to the deregulated status of an apartment is subject to the six-year statute of limitations period set forth in CPLR 213 (2), which is applicable to "an action upon a contractual obligation or liability." Characterizing plaintiffs' claim as essentially seeking a rescission of a contract—the 1999 lease—defendants argue that the action is time-barred as having been commenced more than six years after the inception of the lease. In support of its position, defendants rely exclusively on this Court's decision in *Oxford Towers Co., LLC v Wagner* (58 AD3d 422 [2009]), which we find inapposite.

*Oxford Towers* involved the application of the six-year statute of limitations to a lease agreement of an apartment that became deregulated. Specifically, the plaintiff landlord sought to rescind a 1995 written agreement it had entered with the defendant tenant that provided for successive renewals of the parties' residential lease in the event the apartment became deregulated by

operation of the RSL (58 AD3d at 422). The tenant moved to dismiss the complaint arguing that the six-year statute of limitations applied. The landlord countered that the agreement was void ab initio as against public policy (*id.*). We affirmed the Supreme Court's dismissal of the action as barred by the six-year statute of limitations and rejected the landlord's public policy argument (*id.*). We held that the 1995 agreement was not void ab initio as against public policy because the parties did not deregulate the apartment by the private agreement (*id.* at 422-423).

█ Here, however, the landlord-tenant dispute arises out of a rent-stabilized lease, and not out of a written agreement outside the lease. A landlord-tenant relationship under a rent-stabilized lease is principally defined and governed by statute. When a rent-stabilized tenant's initial lease expires, the tenant becomes a so-called "statutory tenant." By law, every provision of a tenant's original rental agreement remains part of the landlord-tenant relationship imposed on the parties for the remainder of the tenant's occupancy of the unit. Thus, pursuant to the RSL, the rent-regulated status of an apartment is a continuous circumstance that remains until different facts or events occur that change the status of the apartment. This Court considers such legislative mandate so sacrosanct as to be impervious to waiver. Accordingly, this Court has held that parties to a rent-stabilized lease may not "contract out of rent stabilization," even where their agreement bestows obvious advantages on the tenant (*Drucker v Mauro*, 30 AD3d 37, 42 [2006], *appeal dismissed* 7 NY3d 844 [2006]).

Under the circumstances, a tenant should be able to challenge the deregulated status of an apartment at any time during the tenancy. Indeed, courts have uniformly held that landlords must prove the change in an apartment's status from rent-stabilized to unregulated even beyond the four-year statute of limitations for rent overcharge claims. *East W. Renovating* (16 AD3d 166) illustrates the point. In *East W. Renovating*, the apartment became subject to rent stabilization when the owner began to receive J-51 tax benefits. Subsequently, on October 1, 1992, the tenant signed a one-year lease. Because the J-51 benefits were not going to expire until June 30, 1993, the law required that the lease include a J-51 notice that the apartment was to become deregulated on or about June 30, 1993 (16 AD3d at 166). After 1993, the tenant entered into various deregulated leases for the apartment. Eight years later, in 2000, the tenant

filed a rent overcharge complaint. The owner responded by stating that the apartment had become deregulated when J-51 benefits expired in 1993, more than four years before the overcharge complaint was filed. DHCR found that the landlord failed to prove that it had provided the tenant the J-51 notice. As a result, DHCR found that the apartment did not become destabilized after expiration of the J-51 benefits, and that petitioner willfully overcharged the tenants a free market rent (*id.* at 167).

The landlord then brought a CPLR article 78 proceeding to challenge DHCR's determination, asserting primarily the defense that the four-year statute of limitations against rent overcharge complaints barred DHCR from reaching the issue of whether the apartment became destabilized after expiration of the J-51 benefits. Supreme Court dismissed the petition. On appeal, this Court affirmed the dismissal, concluding that the record amply supported DHCR's finding that the landlord failed to provide the J-51 notice that the apartment was to become deregulated (*id.*). As for the statute of limitations defense, this Court held:

> "In fixing the overcharge, DHCR set a base date of January 20, 1996, four years prior to the filing of the overcharge complaint, and calculated the lawful increases forward from that date based on the free market rent that the tenants were paying immediately prior to the base date. We reject petitioner's argument that by so doing, DHCR improperly considered events surrounding the execution of the 1992 lease more than four years prior to the filing of the rent overcharge complaint in January 2000, in violation of Rent Stabilization Law (Administrative Code of City of NY) § 26-516 (a) (2). DHCR's consideration of events beyond the four-year period is permissible if done not for the purpose of calculating an overcharge but rather to determine whether an apartment is regulated." (*Id.*)

While the statute of limitations defense rejected in *East W. Renovating* was the four-year statute applicable to rent overcharge claims, the reasoning for its inapplicability to a rent regulatory status claim extends with equal force to the six-year statute of limitations applicable to breach of contract actions. In our view, imposing such limitations on determining rent regulatory status subverts the protection afforded by the rent-

stabilization scheme described above. Indeed, except as to limit rent overcharge claims, the Legislature has not imposed a limitations period for determining the rent regulatory status of an apartment.

## C. Finality of DHCR Order Deregulating Apartment

█ Notwithstanding our retroactive application of *Roberts* and rejection of the six-year statute of limitations defense, defendants argue that we must still give preclusive effect to the 1999 DHCR deregulation order under administrative finality principles. On this issue, we agree with defendants.

We must give preclusive effect to the 1999 DHCR luxury decontrol order to the extent we find that collateral estoppel precludes plaintiffs from raising the issue of whether the 20th floor apartment was improperly removed from rent stabilization under the luxury decontrol statute 11 years prior to the commencement of this action.

Collateral estoppel applies when (1) the issues in both proceedings are identical; (2) the issue in the prior proceeding was actually litigated and decided; (3) there was a full and fair opportunity to litigate in the prior proceeding; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500-501 [1984]; *Gramatan Home Invs. Corp. v Lopez*, 46 NY2d 481, 485 [1979]). Collateral estoppel is equally applicable to confer conclusive effect to the quasi-judicial determination of an administrative agency (*Ryan*, 62 NY2d at 499). While the proponent of collateral estoppel has the burden of demonstrating that the issue in question is identical and decisive, it is the opponent's burden to show the absence of a full and fair opportunity to litigate the issue in the prior determination (*id.* at 501).

Three of the elements necessary for the application of collateral estoppel cannot be seriously disputed here because (1) the issue before DHCR, whether the subject apartment was properly removed from rent stabilization by luxury decontrol, is identical to the issue before the motion court and this Court, (2) the issue was fully litigated, and (3) the issue was decided in the DHCR proceeding.

Significantly, courts have consistently held that, unless a party can demonstrate the absence of a full and fair opportunity to litigate the issue of the rent-stabilized status of an apartment before DHCR, the agency's determination on this issue is

entitled to collateral estoppel effect precluding the relitigation in court of the same issue determined before the agency (*see e.g.* *9-10 Alden Place v Chen*, 279 AD2d 618 [2001]; *Grassini v Paravalos*, 270 AD2d 52 [2000]; *see also Lorcorp, Inc. v Burke*, 185 Misc 2d 720, 722-723 [2000]). That is precisely the finding of *Grassini* where this Court held that Supreme Court had properly invoked collateral estoppel to resolve the plaintiff's claim that she was entitled to possession of an apartment as a rent-stabilized tenant, since the defendant failed to show that it did not have a full and fair opportunity to litigate the plaintiff's status as a rent-stabilized tenant in the prior rent overcharge proceeding before DHCR (270 AD2d at 52-53).

Similarly, in *9-10 Alden Place* (279 AD2d at 618-619) the Second Department held that the DHCR determination, that the defendant tenant's lease for a rent-stabilized apartment was not the product of fraud, was entitled to collateral estoppel effect since the plaintiff landlord failed to establish that it did not have a full and fair opportunity to litigate the fraud issue before DHCR. Accordingly, the Second Department affirmed the motion court's dismissal of the complaint on the ground that the action was barred by the doctrine of collateral estoppel (*id.* at 619).

Collateral estoppel is also proper in the instant case because we are convinced that plaintiffs had a full and fair opportunity to litigate before DHCR whether their apartment was subject to luxury decontrol. The RSL sets forth an elaborate procedure for luxury deregulation (*see* RSL [Administrative Code] § 26-504.3). The deregulation process begins when the owner of a rent-stabilized apartment, having a legal regulated rent of at least $2,000 per month, furnishes the tenant with an income certification form, triggering the tenant's duty to certify whether the combined household income was above $175,000 for each of the two previous years (*id.* § 26-504.3 [b]). If the tenant certifies that the income was below the threshold amount and the owner contests such certification, the owner may ask DHCR to verify the household income (*id.* § 26-504.3 [c] [1]). DHCR must then request the necessary information from the tenant to allow the New York State Department of Taxation and Finance (DTF) to verify the household income (*id.*). In the event DTF determines that the income surpasses $175,000 for each of the two previous years, DHCR must notify the parties and allow them 30 days to comment on the results (*see id.* § 26-504.3 [c] [2]). Thereafter, "[w]ithin forty-five days after the expiration of the comment pe-

riod, the division shall, where appropriate, issue an order providing that such housing accommodation shall not be subject to the provisions of this law upon the expiration of the existing lease" (*id.*) A tenant aggrieved by a DHCR deregulation order may challenge it first in a petition for administrative review (PAR) before DHCR, and if still dissatisfied with the result, the tenant may seek review before Supreme Court in a proceeding under article 78 of the CPLR.

In light of this elaborate statutory scheme, it is abundantly clear that plaintiffs here had ample opportunity to challenge the prior owner's application for luxury decontrol as being precluded by the receipt of J-51 benefits. That DHCR never held a hearing on the luxury decontrol application is of no moment. While the rent administrator had the authority to order a hearing (RSC [9 NYCRR] § 2107.5 [h]), plaintiffs never asked DHCR for one. Thus, it can reasonably be inferred that the decision by DHCR not to hold a hearing was the result of plaintiffs' failure to raise factual issues regarding the prior owner's luxury decontrol application. Nor can plaintiffs now shift the blame to defendants for any lack of knowledge of the J-51 benefits. The receipt of J-51 benefits is a matter of public record. In addition, landlords have no affirmative duty to provide such written disclosure except to tenants who are subject to rent stabilization *solely* because of the receipt of J-51 benefits (RSL [Administrative Code] § 26-504 [c]; RSC [9 NYCRR] § 2520.11 [o]), which is not the situation here. In any event, DHCR made public its policy on the issue—namely that J-51 benefits had no bearing on a landlord's right to apply for luxury decontrol—when it issued an advisory opinion in 1996, which it incorporated into the RSC in 2000. Thus, since it appears that nothing prevented plaintiffs from raising the J-51 benefits issue before DHCR, plaintiffs are now estopped from relitigating the issue 11 years later.

We are, however, mindful of the fact that, notwithstanding the general rule of administrative finality—giving res judicata or collateral estoppel effect to an administrative agency ruling—DHCR has the discretion to reconsider its determinations under certain circumstances. For instance, RSC (9 NYCRR) § 2527.8 provides that

> "[t]he DHCR, on application of either party, or on its own initiative, and upon notice to all parties affected, may issue a superseding order modifying or revoking any order issued by it under this or any previous Code where the DHCR finds that such or-

der was the result of illegality, irregularity in vital matters or fraud."

The Court of Appeals has confirmed DHCR's broad powers and authority to alter its prior determinations on remission (*see e.g. Matter of Alamac Estates v McGoldrick*, 2 NY2d 87, 89-90 [1956]; *Matter of Yasser v McGoldrick*, 306 NY 924 [1954]; *see also Matter of Alcoma Corp. v New York State Div. of Hous. & Community Renewal*, 170 AD2d 324 [1991], *affd* 79 NY2d 834 [1992]). "In addition, this Court has held that the DHCR may reverse a prior determination, even long after the time to appeal has expired, where the initial order resulted from 'illegality, irregularity in vital matters, or fraud' " (*Matter of Sherwood 34 Assoc. v New York State Div. of Hous. & Community Renewal*, 309 AD2d 529, 531 [2003], quoting *Luchetti v Office of Rent Control, Dept. of Rent & Hous. Maintenance, Hous. & Dev. Admin. of City of N.Y.*, 49 AD2d 532, 534 [1975]).

However, "[o]nce an administrative agency has decided a matter, based upon a proper factual showing and the application of its own regulations and precedent, the parties to that matter are entitled to have the determination treated as final" (*Matter of Peckham v Calogero*, 54 AD3d 27, 28 [2008], *affd* 12 NY3d 424 [2009]). Although, as noted above, a remand may be appropriate where the agency has made the type of substantial error that constitutes an "irregularity in vital matters" (*Matter of Porter v New York State Div. of Hous. & Community Renewal*, 51 AD3d 417, 418 [2008], *lv denied* 11 NY3d 703 [2008] [internal quotation marks omitted]), a final administrative determination cannot be reopened to give a party an opportunity to make a new argument based on the existing administrative record (*Matter of Pantelidis v New York City Bd. of Stds. & Appeals*, 43 AD3d 314, 315 [2007], *affd* 10 NY3d 846 [2008] [no remand is appropriate where a party is "merely seeking a second chance to reach a different determination on the merits" (internal quotation marks omitted)]). That is simply not one of the recognized exceptions to the principle of administrative finality. Thus, having failed to raise the new legal challenge to the former owner's initial application with DHCR, that theory cannot be made the basis of an administrative reconsideration 11 years later.

The Court of Appeals made this exact point more than 30 years ago in *Matter of 54/55 Sixth Realty Corp. v Leventhal* (42 NY2d 935 [1977]), a case with facts strikingly similar to this case. In *Matter of 54/55 Sixth Realty Corp.*, the Court affirmed

the annulment of respondent's determination to revoke a prior administrative order decontrolling the rent on an entire penthouse apartment pursuant to the "luxury" apartment rent decontrol provisions of the New York City Rent, Eviction and Rehabilitation Regulations (42 NY2d at 936). The stated basis for the respondent's revocation of the rent decontrol order was the landlord's failure to disclose that for 30 years the penthouse had been separately occupied as two self-contained apartments, in conflict with the certificate of occupancy (42 NY2d at 936-937). Under the express provisions of the Administrative Code and the Rent, Eviction and Rehabilitation Regulations then in force, luxury apartment rent decontrol was only available to premises occupied for single-family occupancy and thus, as the respondent argued, the original decontrol order was violative of the law. Here, plaintiffs similarly argue that the DHCR luxury decontrol order should be revoked as the landlord's receipt of J-51 benefits was not previously revealed.

The rent control regulations in effect in *Matter of 54/55 Sixth Realty Corp.* incorporated the New York common-law standard of finality of administrative determinations, previously discussed, permitting revocation of a prior order only upon a showing of "illegality, irregularity in vital matters, or fraud" (*Matter of 54/55 Sixth Realty Corp. [Silverstein] v Leventhal*, 51 AD2d 714, 715 [1976] [internal quotation marks omitted]). In that case, the majority in the Appellate Division held that the "[r]espondent's failure to discover facts [regarding the dual occupancy of the penthouse apartment] within its own files" did not amount to such "illegality, irregularity in vital matters, or fraud" (*id.* [internal quotation marks omitted]). The Court of Appeals agreed that the belated discovery of facts within the agency's own files was "not the type of irregularity contemplated by . . . the regulations" (42 NY2d at 937).

In our view, *Matter of 54/55 Sixth Realty Corp.* is, a fortiori, controlling. Here, as in *Matter of 54/55 Sixth Realty Corp.*, the facts required for revocation of the original DHCR determination (the receipt of J-51 benefits) were available from the public record, and explicitly disregarded by DHCR as irrelevant to luxury decontrol because, pursuant to the DHCR policy discussed above, the receipt of J-51 benefits was not the "sole reason" for the imposition of rent regulation. Consequently, we find no inherent power on the part of DHCR, in the instant case, to revoke its previous acceptance of the former owner's petition for luxury decontrol.

Most recently, in *Matter of Peckham v Calogero* (12 NY3d 424 [2009], *affg* 54 AD3d 27 [2008], *revg* 2007 NY Slip Op 32087[U] [2007]), the Court of Appeals reiterated the point applicable here—that where the administrative record is complete, the courts may not order a remand in order to provide the agency with a second chance to reach a different decision on the merits. In *Peckham*, the predecessor landlord filed an application with DHCR requesting permission not to renew the tenant's rent-stabilized lease because it was going to demolish the building (12 NY3d at 428). The rent administrator granted the landlord's application and DHCR denied the tenant's PAR (*id.* at 428-429). The tenant argued before the rent administrator that the landlord's project was not a demolition because its application with Department of Buildings listed it as a reconstruction or alteration rather than a demolition (54 AD3d at 29-30). In his PAR, petitioner tenant abandoned this argument; his only demolition-related argument was that the landlord had performed demolition before its application was approved. In his article 78 proceeding, the tenant made a legal argument, for the first time, that DHCR lacked appropriate standards for what constitutes a demolition (12 NY3d at 429). Supreme Court granted the petition to the extent of remanding the matter to DHCR "to clarify the standard used to determine a 'demolition' and whether this project is a 'demolition,' and to clarify the financial ability of Chelsea [Partners] to complete the project" (2007 NY Slip Op 32087[U], *18).

In a split decision, the Appellate Division reversed (54 AD3d at 28). We found that the record before DHCR was quite sufficient to permit it to determine whether the owner had demonstrated financial ability to complete the project and whether the planned work constituted a demolition (*id.* at 34). In addition, this Court found that the agency's determinations of those issues were rational and completely in accord with well-established principles (*id*). Under the circumstances, this Court found, there was no legitimate ground for the remand by the motion court (*id.* at 29). The Court of Appeals agreed, explaining, inter alia, that the role of a court in an article 78 proceeding is simply to determine whether DHCR's action is arbitrary and capricious, that is, whether it is taken without sound basis in reason or regard to the facts (12 NY3d at 431). "If the court finds that the determination is supported by a rational basis, it must sustain the determination even if the court concludes that it would have reached a different result than the one reached by

the agency" (*id.*). Here, similarly, a remand to DHCR is inappropriate for it would be tantamount to allowing plaintiffs to seek a different result than the one reached by DHCR on a new legal theory never advanced before the agency prior to the commencement of this action.

## Conclusion

The outcome of this case hinges on whether *Roberts* renders the 1999 DHCR luxury decontrol order void ab initio. Preliminarily, we reject defendants' argument that *Roberts* should be given only prospective application. Nor do we find any merit to defendants' argument that we must give preclusive effect to the 1999 DHCR luxury decontrol order because the action was commenced well beyond the six-year statute of limitations applicable to claims arising from strictly contractual obligations. Nevertheless, we do find meritorious and dispositive defendants' argument that we must treat the 1999 DHCR luxury decontrol order as final under collateral estoppel principles. Finally, we find a remand to DHCR inappropriate here because a final administrative determination cannot be reopened to give a party an opportunity to make a new argument, based on the existing administrative record, 11 years later. We modify solely to declare in defendants' favor (*see Lanza v Wagner*, 11 NY2d 317, 334 [1962], *appeal dismissed* 371 US 74 [1962], *cert denied* 371 US 901 [1962]).

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Louis B. York, J.), entered July 15, 2010, which granted defendants' motion to dismiss the complaint, should be modified, on the law, to declare that the 1999 luxury decontrol order is final, and otherwise affirmed, without costs.

Tom, J.P., Sweeny, Acosta and Manzanet-Daniels, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered July 15, 2010, modified, to declare that the 1999 luxury decontrol order is final, and otherwise affirmed, without costs.