[938 NYS2d 30]

Latipac Corp., Appellant, v BMH Realty LLC et al., Respondents.

First Department, February 2, 2012

116

APPEARANCES OF COUNSEL

*Goldberg Weprin Finkel Goldstein LLP*, New York City (*Kevin J. Nash* of counsel), for appellant.

*Greenblatt & Agulnick, P.C.*, Great Neck (*Matthew W. Greenblatt* of counsel), for respondents.

### OPINION OF THE COURT

FRIEDMAN, J.P.

The parties entered into an agreement for the purchase and sale of an apartment building for which the owner received J-51 tax benefits. The agreement included a representation that, as of its date, nine of the building's apartments were fair-market rental units; the owner had deemed those units deregulated pursuant to the luxury decontrol provisions of the Rent Stabilization Law. Before the transaction closed, this Court issued a decision (subsequently affirmed by the Court of Appeals) holding that rent-stabilized apartments in a building receiving J-51 tax benefits were not subject to luxury decontrol (*Roberts v Tishman Speyer Props., L.P.*, 62 AD3d 71 [2009], *affd* 13 NY3d 270 [2009] [*Tishman*]). The primary question on this appeal is whether *Tishman*, which rejected the interpretation of the Rent Stabilization Law then followed by the State Division of Housing and Community Renewal (DHCR), had any effect on the purchaser's contractual obligation to close. We hold that it did not.

Plaintiff Latipac Corp., as purchaser, and defendant BMH Realty LLC, as seller, entered into a written agreement, dated July 15, 2008, for the purchase and sale of the apartment building located at 417-419 East 74th Street in Manhattan, for a purchase price of $6.2 million. Paragraph 41 of the agreement provides:

> "Seller represents that the monthly rents listed on the annexed *Schedule B* are those rents being currently billed to said tenants for the month of July, 2008, but Seller makes no representation as to the continued occupancy of said Premises or any parts thereof by any tenant or tenants now in possession. In the event that there is any inconsistency between the terms and conditions set forth in the leases and

> the rent schedule annexed hereto, the terms and conditions set forth in the leases shall prevail. Seller shall notify Purchaser of any vacancy that arises, but same shall not affect Purchaser's obligations to close hereunder."

The annexed Schedule B, entitled "Rent Roll," sets forth, among other information, the monthly rental of each of the building's units (22 residential and two commercial) and each residential unit's regulatory "status," either "FM" (fair-market) or "RS" (rent-stabilized). Nine of the residential units are identified as having "FM" status; the "legal rent" of each of these nine units is described as "above $2000."

Several other provisions of the agreement are relevant to this appeal. Paragraph 35 provides, in pertinent part:

> "This Contract, as written, contains all the terms of the Contract entered into between the parties, and the Purchaser acknowledges that the Seller has made no representations, is unwilling to make any representations, and held out no inducements to the Purchaser, other than those herein expressed, and the Seller is not liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations or information pertaining to the said Premises as to the physical condition, income, expense, operation, or to what use the Premises can be applied, including but not limited to any matter or thing affecting or relating to the said Premises, except as herein specifically set forth."

Paragraph 43 provides:

> "If there are any complaints, challenges or proceedings pending for the reduction of any of the rentals or if any are filed prior to the closing of title the Seller will comply with and discharge same prior to closing at the Seller's own cost and expense; and if said complaints, challenges or proceedings are not discharged by the Seller, the Seller shall give to the Purchaser a credit for the cost of such discharge of complaints or proceedings at the closing of title. Seller shall remain responsible for any rent roll-backs, overcharges or refunds for the period prior to the closing of title."

Finally, paragraph 48 provides, in pertinent part:

> "If the Seller . . . shall be unable to comply with the obligations, representations or conditions on the part of the Seller to be performed as set forth herein, the sole obligation of the Seller shall be to refund Purchaser's down payment made hereunder, and to reimburse the Purchaser for the cost of title examination, and upon making such refund and reimbursement, this Contract shall wholly cease and terminate."

The closing of the transaction, which the agreement set for September 16, 2008, was postponed by a series of adjournments. By year-end, relations between the parties had become adversarial, with Latipac raising a number of issues that, if not resolved, it deemed grounds for withdrawing from the deal. By letter dated December 29, 2008, BMH set January 30, 2009 as the time-of-the-essence closing date. Latipac responded by letter dated January 6, 2009, in which it claimed that, by reason of, inter alia, unresolved decreased service orders by DHCR concerning two of the apartments (one dating back to 1988, the other to 1992), BMH was in breach of certain representations in the agreement. Based on the claims of breach, Latipac demanded the return of its $310,000 deposit.

On January 29, 2009—the day before the closing date set by BMH—Latipac commenced this action in Supreme Court, New York County, seeking, inter alia, the return of its deposit and, by implication, a ruling that it had no further obligations under the agreement. By order to show cause of the same date, Latipac moved for a preliminary injunction staying the closing and precluding BMH from declaring Latipac to be in default pending resolution of the claims set forth in the complaint. The order to show cause contained a temporary restraining order (TRO) precluding BMH, pending a hearing on the motion, from declaring Latipac to be in default or obtaining release of the escrowed deposit funds. In support of the motion, Latipac argued, among other things, that the agreement was unenforceable because paragraph 43—the provision for a credit to the purchaser at closing for any unresolved DHCR proceedings— was "indefinite, and nothing more than an agreement to agree." As previously noted, decreased service orders concerning two of the building's apartments remained unresolved at the time.

The motion court heard oral argument on Latipac's motion for a preliminary injunction on March 4, 2009. Ruling from the bench, the court denied the motion and vacated the TRO. As

relevant to this appeal, the court found that paragraph 43 was enforceable because "a method of computing the credit [for the two decreased service orders] may be ascertained under [Rent Stabilization Law § ] 25-516 (a) by determining the maximum possible exposure to Latipac in the event that the tenant files and succeeds in a rent overcharge claim before the DHCR." Promptly after the motion court rendered its March 4 decision, BMH notified Latipac, by letter of the same date, that it was setting April 6, 2009, as the new closing date.

On March 5, 2009—the day after the denial of plaintiff's preliminary injunction motion—this Court issued the aforementioned *Tishman* decision. In *Tishman*, we held that a rent-stabilized apartment in a building for which the owner receives J-51 tax benefits (*see* Administrative Code of City of NY § 11-243) is not subject to the luxury decontrol provisions of the Rent Stabilization Law (Administrative Code of City of NY §§ 26-504.1, 26-504.2) until the tax benefit expires or, if the lease did not contain a notice that the unit would be deregulated upon expiration of the tax benefit, until the apartment becomes vacant after expiration of the tax benefit (*see* 28 RCNY 5-03 [f] [3] [i] [A], [B]). The decision, which reversed a judgment of Supreme Court, represented a rejection of the construction of the Rent Stabilization Law followed up to that time by DHCR. Under DHCR's pre-*Tishman* practice, luxury decontrol was deemed applicable to a building enjoying J-51 tax benefits so long as units in the property had not become subject to rent stabilization solely by virtue of the building's participation in the J-51 program (*see Tishman*, 62 AD3d 71, 78-79 [2009], *affd* 13 NY3d 270, 281-282 [2009]).[1]

On April 1, 2009, Latipac moved a second time for a preliminary injunction against being held in default for failing to close. In conjunction with the motion, the motion court again issued a TRO against BMH's proceeding with the closing, declaring Latipac to be in default, or obtaining release of the deposit. On this second application, Latipac contended, as here pertinent, that it was no longer obligated to go through with the closing because "the representations set forth in the rent roll concern-

---

1. As the Appellate Term, First Department, recently observed, DHCR's pre-*Tishman* "long-standing and unambiguous interpretation of the luxury decontrol statute" had been "codified in Rent Stabilization Code (9 NYCRR) § 2520.11 (o) and [went] unchallenged for the better part of a decade until determined to be erroneous by the [*Tishman*] court" (*72A Realty Assoc. v Lucas*, 32 Misc 3d 47, 49 [2011]).

ing the deregulated status of close to half of the apartments [are] no longer accurate in light of [the] important new ruling just issued by the Appellate Division, First Department, in [*Tishman*]." Pointing to the building's receipt of J-51 tax benefits from 1998 through 2008, Latipac argued that, under *Tishman*, "those representations [that nine apartments had fair-market rental status] are no longer valid," thereby giving Latipac "significant new grounds to hold BMH in default for breach of the Contract." Latipac further asserted that, although the parties' agreement predated *Tishman*, "the representations and accuracy of the Rent Roll [i.e., Schedule B to the Agreement] must be true as of the date of closing and, therefore, need to conform to [*Tishman*] as the current governing law in the First Department."[2]

In opposing the second preliminary injunction, BMH did not dispute that it had deemed the nine apartments at issue subject to luxury decontrol while the building was receiving J-51 tax benefits during the period from 1998 through 2008. Nor did BMH contend that any of the nine apartments at issue had become vacant since the building's J-51 tax benefits terminated at the end of 2008, which vacancy would make the apartment once again eligible for luxury decontrol (*see* 28 RCNY 5-03 [f] [3] [i] [A]). BMH did argue that Latipac's argument based on *Tishman* was "not ripe" for consideration because the Appellate Division, on consent of the parties to the *Tishman* action, had stayed the *Tishman* decision's effect pending determination of a motion for leave to appeal to the Court of Appeals and any ensuing appeal. In reply, Latipac argued that the stay of *Tishman* affected only the parties to that action, was conditioned on the landlord's compliance with a number of burdensome requirements, and did not affect the precedential force of the decision's holding.

At oral argument on April 9, 2009, the motion court requested further briefing on the question of whether *Tishman* had any effect on the parties' contractual rights and obligations. Latipac, in its submission, argued that, under the doctrines of impossibility of performance and frustration of purpose, the issuance

---

**2.** While Latipac acknowledged that the building's J-51 tax benefits had expired at the end of 2008, it argued that, under *Tishman*, the apartments in question would not become subject to luxury decontrol until the first vacancy after the expiration of the tax benefit because their leases—which were based on the understanding that the apartments were already deregulated—did not contain a notice that the units would become deregulated upon expiration of the J-51 tax benefits (*see* 28 RCNY 5-03 [f] [3] [i] [A], [B]).

of *Tishman* excused its performance of the agreement. BMH disputed the applicability of those doctrines, suggesting that Latipac's true reason for wanting to get out of the deal was the "downturn in real estate" that had occurred since the signing of the agreement in July 2008.

On June 17, 2009, the motion court, again ruling from the bench, denied Latipac's second preliminary injunction motion. The court found that, even assuming the issue to be ripe for decision notwithstanding the stay entered in *Tishman*, Latipac had failed to show a likelihood of success on the merits of its claim that, under the doctrines of impossibility and frustration of purpose, *Tishman* relieved it of the obligation to close.[3] About four months later, in October 2009, the Court of Appeals affirmed this Court's decision in *Tishman* (13 NY3d 270 [2009]).

Now before us are Latipac's consolidated appeals from the decisions of March and June 2009 denying, respectively, its first and second preliminary injunction motions. For the reasons discussed below, we affirm.

We first address Latipac's appeal from the March 2009 order denying its first motion for a preliminary injunction. The only ground on which we are urged to reverse this order is that the motion court erred in determining that the parties' agreement was enforceable notwithstanding the failure of the above-quoted paragraph 43 to specify a method for calculating the amount of credit due Latipac at closing for unresolved DHCR proceedings. This argument is unavailing. The motion court properly determined that the amount of credit for the unresolved decreased services orders concerning two apartments should be determined by reference to section 26-516 (a) of the Rent Stabilization Law (Administrative Code of City of NY), which sets forth the penalty to which a landlord is subject for collecting rent in excess of the lawful regulated amount (*see Cobble Hill Nursing Home v Henry & Warren Corp.*, 74 NY2d 475, 483 [1989], *cert denied* 498 US 816 [1990] ["Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear"]).

We turn now to Latipac's appeal from the June 2009 order denying its second motion for a preliminary injunction, which

---

3. The motion court also rejected Latipac's alternative argument that a hearing before a referee was required to determine the amount of credit due Latipac based on the two unresolved decreased service orders. Latipac does not press this argument on appeal.

was based on the issuance of the *Tishman* decision. In its reply brief, Latipac clarifies that, on this appeal, it no longer presses the argument that, by reason of *Tishman*, it is excused from performing under the doctrines of frustration of purpose and impossibility.[4] Rather, with respect to the second order under review, Latipac argues only that *Tishman* establishes that BMH is in breach of its representation in the agreement that the building contained nine deregulated apartments, for which fair-market rentals could lawfully be charged. Specifically, Latipac argues that, in light of *Tishman*,

> "[BMH] cannot abide by its representations regarding delivery of nine fair market apartments . . . In other words, although the Contract required and obligated [BMH] to deliver nine fair market units, [BMH] could not deliver a single one. Given this circumstance, the return of the Deposit was the least [BMH] should be obligated to do."

In support of its argument that the issuance of *Tishman* placed BMH in breach of the agreement, Latipac contends that the *Tishman* holding should be given retroactive effect. We agree that the *Tishman* holding is entitled to retroactive effect in a proper case, for example, where a tenant, on an appropriate set of facts, invokes that holding in a timely-commenced proceeding seeking to restore an apartment to rent stabilization. Indeed, this Court has so held, most recently on a subsequent appeal in *Tishman* decided while the instant appeal was sub judice (*Roberts v Tishman Speyer Props., L.P.*, 89 AD3d 444 [2011]; *see Gersten v 56 7th Ave. LLC*, 88 AD3d 189, 196-198 [2011]; *72A Realty Assoc. v Lucas*, 32 Misc 3d at 49).

The appeal before us, however, does not arise from a landlord-tenant dispute. Rather, we are presented with a

---

4. If the frustration of purpose and impossibility arguments were still at issue, we would find that the motion court correctly rejected them. Manifestly, the return of nine apartments to rent-stabilized status does not render impossible plaintiff's contemplated use of the building; it simply reduces the profitability of that use to a certain extent. Neither can it be said that BMH's inability to deliver nine free-market rental units frustrated the fundamental purpose of the transaction. In this regard, plaintiff, in its arguments to the motion court and in its initial appellate brief, misplaced its reliance on *Anderson v Steinway & Sons* (178 App Div 507 [1917], *affd* 221 NY 639 [1917]). In *Anderson*, the buyer's contemplated use of the property was rendered altogether unlawful, and hence impossible, by a zoning ordinance adopted after the execution of the contract. In that situation, the Court of Appeals held that "it would be inequitable . . . to decree specific performance" in favor of the seller (221 NY at 640).

controversy between parties that entered into a contract for the purchase and sale of an apartment building. In resolving such a buyer-seller dispute, the accuracy of the contract's representation that the building contained nine deregulated apartments should be determined as of the time the buyer and seller understood that representation to speak, whether the time in question was the date of the contract's execution or the date of closing. Moreover, the truth of the representation should be determined from the point of view of the parties *at the relevant time*, not—as would be appropriate in a landlord-tenant dispute—viewed retrospectively from a later date following a judicial decision that overturned the understanding of the law that the parties (along with the responsible administrative agency and the entire real estate industry) reasonably shared at the time they contracted. Given that the rent stabilization laws were enacted to protect tenants, not prospective landlords, there is no reason to read back into a previous time a subsequent judicial decision that, although it construed unchanged statutory language, radically altered the legal landscape against which the parties contracted.

■ It remains to be determined as of which time—the time of contracting or the time of closing—the contractual representation at issue (that the building contained nine deregulated apartments) speaks. On its face, the representation addresses only the time of contracting (July 2008), and does not constitute a promise to deliver nine fair-market rental units at closing. The above-quoted paragraph 41 of the agreement, which incorporates by reference the annexed Schedule B, identifies nine apartments as having "FM" (fair-market) regulatory status as of July 2008. Nothing in that paragraph gives so much as a hint that the seller guaranteed that the regulatory status of those apartments—or any of the matters set forth in Schedule B—would remain unchanged from July 15, 2008 (the date of the contract) until the time of closing. The parties could easily have drafted the contract to provide, in unmistakable language, that the buyer's obligation was conditioned on any or all of these matters remaining unchanged on the date of closing. That they did not do so gives rise to a compelling inference that they did not intend the buyer's obligation to be so conditioned. Moreover, in paragraph 35 of the agreement, Latipac expressly "acknowledges that the Seller has made no representations, is unwilling to make any representations, and held out no inducements to the Purchaser, other than those herein expressed, and

[that] the Seller is not liable or bound . . . except as herein specifically set forth."

■ In sum, we are satisfied that the agreement's representation that the building contained nine deregulated apartments spoke only as of the time of contracting (July 2008). To the extent this does not resolve the parties' dispute, the next question is whether it was the buyer or the seller that bore the risk that a legal development would effect a change in the regulatory status of those apartments during the interval between contracting and closing. We conclude, for the reasons explained below, that Latipac, the buyer, bore that risk.

It is well established that, unless a contract for the sale of real property expressly provides otherwise, the buyer bears the risk that the property's value will be reduced by a change in the law between the execution of the contract and the closing (*see Urbis Realty Co. v Globe Realty Co.*, 235 NY 194 [1923] [buyer bore risk of change in regulation of landlord-tenant relations]; *Froehlich v K. W. W. Holding Co., Inc.*, 116 Misc 275 [Sup Ct, Kings County 1921], *affd* 201 App Div 855 [1922] [same]; *DiDonato v Reliance Std. Life Ins. Co.*, 433 Pa 221, 249 A2d 327 [1969] [buyer bore risk of zoning change]; *Kend v Crestwood Realty Co.*, 210 Wis 239, 246 NW 311 [1933] [same]; 14 Nehf, Corbin on Contracts § 77.10, at 288 [rev ed 2001] ["In the absence of some statute or expression in the contract to the contrary, the risk of the (enactment of a new) restriction (on use of the property) will usually be allocated to the purchaser"]; Stoebuck and Whitman, Law of Property § 10.13, at 793 [3d ed 2000] ["Losses due to changes in the property's legal status are often imposed on the purchaser under equitable conversion"]; 77 Am Jur 2d, Vendor and Purchaser § 171).

Imposing the risk of a change in the law on the buyer (absent a contractual provision to the contrary) follows from the common-law doctrine of equitable conversion, "under which the execution of the contract of sale makes the buyer the equitable owner of the property and the seller the holder of legal title as security for the purchase price" (1 Smith, Friedman on Contracts and Conveyances of Real Property § 4:10.1, at 4-64 [7th ed 2011]). Before the enactment of statutes addressing the issue, the majority of states, including New York, pursuant to the doctrine of equitable conversion, required the buyer, where the contract was silent, to bear the risk of casualty befalling the property between the execution of the contract and the closing (*id.* at 4-63; 2 Warren's Weed, New York Real Property § 25.41,

at 25-90 [5th ed]; *see Sewell v Underhill*, 197 NY 168 [1910]; *Heerdt v Brand*, 272 App Div 143, 145 [1947] [noting that, before adoption of the uniform statute, New York followed "(t)he rule that risk of loss falls on the vendee and not the owner, the vendor," which rule "became, likewise, the law of the majority of American jurisdictions"]). Of course, the Uniform Vendor and Purchaser Risk Act (General Obligations Law § 5-1311 [former Real Property Law § 240-a]) displaces the common-law rule where applicable, but that statute does not cover the risk of a change in the law.

As previously discussed, the agreement's representation concerning the regulatory status of the nine deregulated apartments, on its face, spoke only as of the time the parties contracted—at which time the representation was accurate under the construction of the Rent Stabilization Law by which DHCR and the real estate industry had operated for a decade. Moreover, the inference that the parties did not intend to make the buyer's obligation conditional on the unchanged regulatory status of the building's apartments becomes well-nigh inescapable when one considers that the *Tishman* case that ultimately resulted in the relevant change in the law was the object of significant media attention long before the parties entered into their contract. The New York Times ran a news article about *Tishman* when that action was commenced in January 2007 (*see* Bagli, *Suit Challenges Rent Jumps in Complexes MetLife Sold*, New York Times, Jan. 23, 2007 [reproduced in the record on appeal]). *Tishman* was also the subject of a front-page New York Law Journal news article when Supreme Court rendered its subsequently reversed August 2007 decision in the case (*see* Hamblett, *Benefit Held No Bar to Market Rents at Stuyvesant Town*, NYLJ, Aug. 24, 2007, at 1, col 3), and of another New York Law Journal article legally analyzing the Supreme Court decision in October 2007 (*see* Mollen, *Realty Law Digest*, NYLJ, Oct. 10, 2007, at 5, col 1). As sophisticated investors in the New York City real estate market, the parties to this action presumably were aware of *Tishman* when they entered into their agreement in July 2008, nearly a year after the initial *Tishman* decision and during the pendency of the appeal of that decision to this Court. The agreement's terse recital of the status of the apartments under the rent stabilization laws as of July 2008—a reference that was, at that time, entirely consistent with the relevant government records and the then-prevailing construction of applicable law—does not justify a leap to the conclusion

that the parties intended to condition the buyer's obligation on the outcome of the *Tishman* appeal.

Instructive here is *Urbis Realty Co. v Globe Realty Co.* (235 NY 194 [1923], *supra*), a case from the early days of rent regulation that bears an uncanny resemblance to this one. *Urbis* holds that a change in the law enacted between the execution of the contract and the closing did not relieve the buyer of its obligation to carry out the agreement. In *Urbis*, "[t]he contract for the conveyance of the [apartment] building contained a provision that the premises should be taken 'subject also to existing leases all of which [save one] expire or contain provisions for cancellation on or before October 1st, 1920' " (*id.* at 198 [quoting Appellate Division's findings of fact]). On the very date set for closing, however, a new rent-regulation law was enacted and went into effect that made it "practically impossible for the landlord to select his own tenants after the expiration of [the existing] leases or to freely contract with desirable tenants in possession as to the rentals to be paid" (*id.* at 199). On this basis, the Appellate Division held that the plaintiff buyer was entitled to the return of its deposit, since the new law "ma[d]e it impossible for the plaintiff to obtain possession of the apartments . . . on the first day of October, 1920, as provided in said contract" (*id.* at 198-199). The Court of Appeals reversed, rejecting the Appellate Division's view that the contract's recital that all leases but one would expire or be subject to cancellation on or before October 1, 1920, meant that

> "the parties (*i.e.*, both parties) were aware that plaintiff agreed to purchase the premises with the understanding that it could have possession of all the premises excepting the apartment on the ground floor by October first. If such was the understanding of plaintiff, why did it not insist that the contract should in unmistakable terms so provide? Why did it execute a contract and covenant to purchase the property *subject* to existing leases, the terms of which were truthfully and specifically stated therein? The circumstances surrounding the case would rather tend to show that such understanding by plaintiff was not conceived until the passage of the statute in April" (*id.* at 201).

In this case, BMH's representation in the agreement that nine apartments had fair-market rental status as of July 2008 was true when made, consistent with the understanding of the

law under which DHCR and the real estate industry had been operating for years. Although the parties were presumably on notice when they entered into the agreement of the pendency of litigation that might bring the validity of the fair-market rental status of the nine apartments into question, they put nothing in the agreement that could be construed as a warranty that such status would not change before closing (*see Froehlich v K. W. W. Holding Co., Inc.*, 116 Misc at 279 ["While none of the housing legislation had actually been enacted when this contract was made, it was being discussed publicly and generally, and the possibility of some statutes being passed affecting the question must have been within the contemplation of the parties when they signed the contract. But they made no exception to cover such a possibility"]). We decline Latipac's invitation to read into the agreement an unspoken promise to deliver at closing nine fair-market rental apartments. Accordingly, Latipac, as buyer, bore the risk of a legal development occurring between contracting and closing that would affect the fair-market rental status of the nine apartments at issue—a risk, to reiterate, of which both parties reasonably should have been aware when the agreement was executed. Hence, when that risk came to fruition with the issuance of this Court's *Tishman* decision on March 5, 2009, Latipac was not discharged of its obligation to perform the agreement.

Even if the agreement could be construed to obligate BMH to deliver nine fair-market rental apartments at closing (and, as already discussed, we find such a construction untenable), the fact remains that as of January 30, 2009—the date for which BMH issued a "time of the essence" closing notice—this Court had not yet issued its decision in *Tishman*. Thus, as of January 30, 2009, DHCR continued to deem luxury decontrol applicable to rental properties enjoying J-51 tax benefits so long as the property had not become subject to rent stabilization solely by virtue of participation in the J-51 program (*see Tishman*, 13 NY3d at 281-282). Of course, the closing did not occur on January 30, 2009, but that was due to the TRO that Latipac had obtained the day before in support of its first preliminary injunction motion, which was denied on March 4, 2009. On this appeal, we have rejected the only argument Latipac raises to challenge the denial of that motion. Thus, for present purposes, it is established that Latipac's first preliminary injunction motion—the sole basis for the delay of closing beyond January 30—had no merit.

It is well established that a party that has been erroneously enjoined is entitled, upon dissolution of the injunction, to recover restitution from the party that sought the injunction for any unjust enrichment thereby obtained, without regard to the posting of an undertaking or proof of malice (*see Cooper v Schube*, 101 AD2d 737 [1984] [owner was entitled to recover, as "restitution for unjust enrichment," the fair market value of tenant's use and occupancy of apartment during pendency of injunction against eviction]; *Bedell Co. v Harris*, 228 App Div 529, 536 [1930] [same]; *Village of Johnson City v Glanville*, 108 Misc 2d 531 [Sup Ct, Broome County 1981] [village was entitled to recover payments it made to employee pursuant to subsequently reversed preliminary injunction]; 1 Dobbs, Remedies § 2.11 [3], at 266-267 [2d ed 1993]; 42 Am Jur 2d, Injunctions § 317; 67A NY Jur 2d, Injunctions § 220; 12A Carmody-Wait 2d § 78:246; Note, *Interlocutory Injunctions and the Injunction Bond*, 73 Harv L Rev 333, 348-351 [1959]). As stated by this Court:

> "Although damages may not be awarded because an injunction was wrongfully obtained unless the case is one of malicious prosecution, when rights and duties have been re-established after litigation, a party is entitled to seek restitution for any wrongful deprivation, even if the deprivation resulted from a court order upon which its adversary relied" (*Dzubey v Teachers' Coll.*, 87 AD2d 783, 784 [1982] [citation omitted]).

In this case, even assuming that BMH had obligated itself to deliver nine fair-market rental apartments at closing, it would unjustly enrich Latipac to allow it to recover its deposit based on a change in the law that occurred before closing due solely to Latipac's having procured a TRO against the noticed January 30 closing in support of a motion that was ultimately denied—a denial that has been affirmed on this appeal. In essence, Latipac—which, but for the TRO, plainly would have been in default had it refused to close on January 30—now asks this Court to reward it for having delayed the closing by making a meritless motion. Latipac was entitled to make the motion— there is no contention that the TRO was procured maliciously— but, the motion having been denied and the denial having been affirmed on appeal, there is no reason, in equity and good conscience, to allow dilatory tactics of this sort to shift to BMH, as seller, the risk of an adverse change in the law or other develop-

ment that would excuse Latipac's performance as buyer (*cf. Tinker v McLellan*, 165 Cal App 2d 291, 331 P2d 464 [1958] [where the purchasers delayed closing by failing to honor their promise to pay certain closing costs, and the property was damaged by a flood after the date on which closing was to have occurred, the purchasers were estopped to rely on the contractual provision that placed the risk of pre-closing loss upon the sellers]).

We emphasize that, in deciding this appeal, we express no view as to whether any or all of the tenants of the nine apartments identified as fair-market rental units in the parties' agreement will be successful in the event they bring proceedings to restore their units to rent stabilization. The effect of the *Tishman* holding on particular properties must be determined on a case-by-case basis. As the Court of Appeals observed, *Tishman*'s impact on a given rental unit will depend on factors including "the statute of limitations, and other defenses that may be applicable to particular tenants" (13 NY3d at 287). For example, in the event DHCR rendered an order deregulating a particular apartment that either went unchallenged within the applicable limitation period or, if timely challenged, was affirmed on administrative or judicial review, the tenant will presumably be precluded by principles of res judicata from seeking the restoration of rent stabilization (*see Gersten*, 88 AD3d 189 [2011], *supra*). The present record does not disclose whether DHCR rendered such an order as to any of the nine apartments at issue.[5] In any event, given that the tenants of the nine apartments are not parties to this action, it would be inappropriate to comment on the viability of their potential claims.

Finally, given our determination that Latipac was not entitled to a preliminary injunction even if our March 2009 *Tishman* decision had immediate force as binding precedent, we need not reach BMH's argument that *Tishman* provided no basis for granting Latipac relief by reason of the stay of its enforcement pending the appeal to the Court of Appeals.

Accordingly, the orders of the Supreme Court, New York County (Joan A. Madden, J.), entered March 9, 2009, and August

---

**5.** The record contains a due diligence report prepared for Latipac that refers to one of the apartments as having been "registered" by the owner as "[d]eregulated" in 2003. However, the report does not state whether that apartment was deregulated pursuant to an order of DHCR, nor does the report disclose whether any of the other apartments were deregulated by order of DHCR.

14, 2009, which denied plaintiff's successive motions for preliminary injunctive relief, should be affirmed, with costs.

SWEENY, CATTERSON, RENWICK and ROMÁN, JJ., concur with FRIEDMAN, J.P.

Orders, Supreme Court, New York County, entered March 9, 2009 and August 14, 2009, affirmed, with costs.