[50 NYS3d 377]

In the Matter of Catherina Park et al., Appellants, v New York State Division of Housing and Community Renewal et al., Respondents.

First Department, April 6, 2017

## APPEARANCES OF COUNSEL

*Sokolski & Zekaria, P.C.*, New York City (*Daphna Zekaria* of counsel), for appellants.

*Mark F. Palomino*, New York City (*Martin B. Schneider* of counsel), for New York State Division of Housing and Community Renewal, respondent.

*Robert M. Olshever, PC*, New York City (*Robert M. Olshever* of counsel), for 27 Washington Sq. North Owner LLC, respondent.

## OPINION OF THE COURT

GISCHE, J.

This is yet another appeal that requires us to resolve issues in the aftermath of the Court of Appeals' decision in *Roberts v Tishman Speyer Props., L.P.* (13 NY3d 270 [2009]). The disputes before us arise from the fair market rent appeal (FMRA) petitioners filed with respondent New York State Division of Housing and Community Renewal (DHCR), implicating both the regulatory status of their apartment and the legality of the rent they were charged from the time they first took occupancy in 2010.

The DHCR decision being challenged in this CPLR article 78 proceeding denied the FMRA as untimely because it was filed more than four years after the apartment was no longer subject to the rent control laws following the death of the previous tenant in 2004. DHCR rejected petitioners' contention that the applicable statute of limitations should be disregarded because the owner had engaged in fraud. DHCR also rejected petitioners' claim that the owner's late notices and/or registrations had extended the time period within which petitioners could file an FMRA challenging the owner's efforts to set an initial rent

following the apartment's removal from rent control. Finally, on the merits, DHCR concluded that petitioners were not entitled to either a rent-regulated apartment or regulated rent because in 2010, when they first took occupancy, the apartment was no longer receiving any J-51 tax benefits and had become vacant at a time when the legal vacancy rent clearly exceeded $2,000 per month, an amount sufficient to make it high-rent/vacancy, "luxury" decontrolled (Rent Stabilization Law of 1969 [RSL] [Administrative Code of City of NY] § 26-504.2 [a]). We find that the motion court properly dismissed the petition because DHCR's determination was neither arbitrary nor capricious, it was supported by a rational basis and was not affected by any error of law (CPLR 7803; *Matter of Classic Realty v New York State Div. of Hous. & Community Renewal*, 2 NY3d 142, 146 [2004]; *see Matter of Boyd v New York State Div. of Hous. & Community Renewal*, 23 NY3d 999 [2014]).

Most of the critical events in this case that have transpired over the past decade are either unrefuted or undisputed. In November 2010, petitioners first became the tenants of apartment 3C at 27 Washington Square North in Manhattan, pursuant to a one year written lease. Although the building was, at one time, part of the J-51 tax abatement program,[1] by the time the parties entered into their first lease, the J-51 benefits had already expired. Petitioners initially paid a market rent of $7,400 per month for the six room apartment, which consisted of three bedrooms, two bathrooms, three fireplaces, central air conditioning, an updated kitchen and bamboo floors.[2] Prior to their tenancy, apartment 3C had been occupied by Uta Hagen Berghof, a rent-controlled tenant. Berghof occupied the apartment from 1984 until her death in April 2004. At the time of Berghof's death, the registered maximum base rent (MBR) for the apartment was $1,548.48 a month.

After tenant Berghof died, the owner undertook major renovations to the apartment. The owner provided DHCR with

1. *See* Administrative Code of City of NY § 11-243 (previously § J51-2.5). The City's "J-51" program, authorized by Real Property Tax Law § 489, allows property owners who complete eligible projects to receive tax exemptions and/or abatements that continue for a period of years (*see* Administrative Code § 11-243 [b] [2], [3], [8]; 28 RCNY 5-03 [a]).

2. Petitioners thereafter renewed the lease for another year at a rent of $7,500 per month. When the renewal lease expired on October 31, 2012, the landlord commenced a holdover proceeding against them claiming that their tenancy was not subject to any form of rent regulation (*27 LLC v Kyun Sang Park and Catherina Park*, Civ Ct, NY County, index No. L&T 86068/12).

copies of its contracts with an architect, various contractors, and service providers, as well as invoices marked "paid," statements, bills and cancelled checks, all in support of the owner's claim that the work had not been ordinary repairs, but a gut renovation of the apartment. The owner also produced documentary support for its claim that the expenditures for these individual apartment improvements (IAIs) had exceeded $200,000.[3]

In setting a fair market rent for the vacant apartment in 2005, the owner sought to take advantage of two increases that were available to it under the rent regulation laws. One increase was simply due to the apartment becoming vacant; that increase, which was equal to 50% of the MBR, raised the rent from $1,548.48 to $2,322.72 (RSL § 26-513 [b] [1]; NY City Rent Guidelines Board Order No. 36). The other increase was equal to one fortieth of the cost of the owner's IAI expenditures, which in this case was $5,034.57 ($201,382.89 x 1/40) (RSL § 26-511 [c] [13]). Adding these amounts to the registered MBR increased the rent to $7,357.29.

The first tenant to rent the apartment after it was renovated was Piers Playfair. Playfair and the owner entered into an unregulated, two year lease, commencing May 1, 2005, at a monthly rent of $7,200. In returning the apartment to a free market, unregulated status in 2005, the owner relied on a two-step analysis. First, as a result of Berghof's death, the rent-controlled apartment became vacant, making it subject to rent-stabilization (*see* NY City Rent and Rehabilitation Law [Administrative Code of City of NY] § 26-403 [e] [2] [i] [9]; *see also* DHCR Fact Sheet No. 6). This first step was consistent with prevailing law and remains unchallenged. The second step taken by the owner was to decontrol the apartment on the basis that the rent exceeded the high rent/vacancy threshold for luxury decontrol (RSL § 26-504.2 [a]). Although the building was part of the J-51 tax abatement program in 2005, the landlord's belief that it could rely on the luxury decontrol laws to return the apartment to the free market was consistent with the DHCR's interpretation of the relevant laws and regulations at that time (*Roberts* at 281). This second assumption turned out to be incorrect.

Playfair remained the tenant of apartment 3C for over four years. He renewed the lease twice, first for a two-year term

---

**3.** Petitioners disputed the bona fides of the renovation. The DHCR, however, did not reach this issue.

commencing May 29, 2007 at a monthly rent of $7,825, and then again for a one-year term commencing November 1, 2009 at a monthly rent of $7,600. On September 30, 2010, before the last renewal lease expired, Playfair surrendered the apartment and moved out. Throughout most of the time that Playfair occupied the apartment, the owner was receiving J-51 tax exemption benefits for the building. The benefits expired, however, in June 2010, shortly before Playfair permanently vacated the apartment. Although it does not appear that while he was in occupancy Playfair was served with an RR-1, which is the notice setting an initial fair market rent for an apartment that is removed from rent control, Playfair never filed his own FMRA.

In 2009, the Court of Appeals decided *Roberts*, rejecting DHCR's position that buildings independently subject to rent stabilization, but also participating in the J-51 tax benefits program, could deregulate apartments pursuant to the luxury decontrol laws while they were actually receiving J-51 benefits. The Court held that owners of rent-stabilized apartments in buildings receiving J-51 benefits remain subject to rent stabilization for at least as long as the J-51 benefits are in force (*see* 28 RCNY 5-03 [f]; *Roberts* at 286). *Roberts* expressly left open certain important issues, including whether it had retroactive effect (*id.* at 287). It did not address other consequent issues, including what effect, if any, the expiration of the J-51 benefits would have on the rent-regulated status of affected apartments.

In 2011, this Court decided *Gersten v 56 7th Ave. LLC* (88 AD3d 189 [1st Dept 2011]), holding that *Roberts* has retroactive application. We reached our conclusion by reasoning that the Court of Appeals had not established a new principle of law; it only construed law that had been in effect for years (*id.* at 198). Although our decision in *Gersten* was appealed, the appeal was withdrawn in March 2012 (18 NY3d 954 [2012]). Since that time, controlling authority has required that owners who had previously luxury decontrolled apartments while still receiving J-51 tax benefits must register those apartments and retroactively restore them to rent stabilization. On February 6, 2012, this owner, consistent with *Gersten*, filed amended registration forms with DHCR, including a Report of Vacancy Decontrol (DHCR form RA-42V-NYC), an RR-1, and amended annual rent registrations for the apartment for the years 2006

through 2011.[4] These forms were mailed to both petitioners and Playfair. On April 16, 2012, within 90 days of the owner's retroactive registration, petitioners filed their FMRA, albeit almost seven years after the apartment was first removed from rent control.

In its decision, DHCR rejected petitioners' position both procedurally, as barred by the statute of limitations, and on the merits, finding that there was no validity to their claims that the apartment remains subject to rent regulation, and the free market rent they have been charged is illegal. Addressing the merits first, DHCR's conclusion that the circumstance of petitioners' occupancy did not entitle them to the benefit of a rent-stabilized rent is amply supported in the record.

After the rent-controlled tenant's death in April 2004, and by operation of law, the apartment became subject to rent stabilization when, on May 1, 2005, it was first offered for rent after that vacancy. Because, however, the owner was still receiving J-51 tax exemption benefits for the building at that time, as subsequent court decisions in *Roberts* and *Gersten* make clear, the owner had no right to return the apartment to the free market by relying on the luxury decontrol laws. There is no question that Playfair, as the tenant taking occupancy in 2005, was entitled to the benefits of rent-stabilization, including important rights of renewal and capped increases. Nonetheless, the rent stabilization laws would have permitted the owner at that time (in 2005) to have increased the rent to an amount over what had been the rent-controlled MBR Berghof had been paying and what had been registered with DHCR (i.e. $1,548.48). This entitled the owner to a vacancy allowance increase that would have raised the base rent to a minimum of $2,322.72 per month (RSL § 26-513 [b] [1]; Rent Guidelines Board Order No. 36). In addition, it was also permissible under the rent stabilization laws to charge an increase for IAIs, which also would result in an increase in the rent (RSL § 26-511 [c] [13]; *Elisofon v New York State Div. of Hous. & Community Renewal*, 262 AD2d 40 [1st Dept 1999], *lv denied* 94 NY2d 757 [1999]).

---

4. Petitioners' argument, that the owner's actions in retroactively registering the apartment as rent stabilized was motivated by their inquiries, is a red herring. Until March 2012, the legal issue of whether the owner was required to retroactively register the apartment was unclear. At about the time the issue was clarified, the owner did retroactively register the apartment.

Before petitioners became the tenants of apartment 3C, there were pivotal events that affected the regulated status of the apartment; not only had the J-51 benefits expired several months earlier, they had expired before the previous tenant, Playfair, had surrendered the apartment.

Although the underpinnings of *Roberts* involved a situation where an owner luxury decontrolled an apartment while it was still receiving J-51 benefits, the Court did not reach the issue of what happens when such benefits expire. Nor did the Court address whether, and under what circumstances, an owner may seek deregulation of an apartment pursuant to the luxury decontrol laws. In *Matter of Schiffren v Lawlor* (101 AD3d 456 [1st Dept 2012]), this Court broadly addressed the issue as follows: "[A] building that is already regulated when it receives J-51 benefits will continue to be regulated under the original rent-regulation scheme when the tax benefits expire" (*Schiffren* at 457). However, "the reversion to pre-J-51-benefit rent-regulation status includes the right of an owner to seek luxury deregulation in appropriate cases" (*id.*). More recently, in *Matter of Bramwell v New York State Div. of Hous. & Community Renewal* (147 AD3d 556 [1st Dept 2017]), this Court recognized that where an apartment is subject to rent stabilization before receiving J-51 benefits, it resumes its former rent-stabilized status upon the expiration of those benefits.

Applying these precedents to the circumstances surrounding the parties' dispute, it is clear that in 2010, after the J-51 benefits expired, the apartment remained subject to rent stabilization. In the absence of J-51 benefits, the rent stabilization laws permit an owner to rely on the luxury decontrol laws, and if their attendant conditions are met, to deregulate an apartment. When the petitioners leased this apartment in 2010, all the circumstances permitting luxury decontrol were present and satisfied. By then the J-51 benefits had expired. They had expired before Playfair, the previous tenant, moved out of the apartment. Also, the last legally permissible rent exceeded the luxury decontrol threshold, then $2,000 per month. Consequently, the apartment was properly leased to petitioners as unregulated and at a free market rent (RSL § 26-504).

Even though the owner had improperly removed the apartment from rent stabilization in 2005, the legal rent that it could have charged in 2005 under the rent stabilization law easily exceeded the $2,000 threshold required for luxury

deregulation. The 2005 vacancy allowance alone brought the rent for the apartment to $2,322.72, an amount that was over the threshold. The owner's 2004-2005 post-vacancy improvements would also have entitled the owner to increase the rent over the threshold amount, attributable to those IAIs (*see Jemrock Realty Co. LLC v Krugman*, 72 AD3d 438 [1st Dept 2010], *lv dismissed* 15 NY3d 866 [2010]). DHCR rationally concluded that it did not have to consider the bona fides of the IAIs because the permitted vacancy rent increase allowance, by itself, supported luxury decontrol.

Petitioners are not entitled to a different result, even though for a period of time during their occupancy the apartment was not registered with DHCR (*see Jazilek v Abart Holdings, LLC*, 72 AD3d 529, 531 [1st Dept 2010]). When the owner treated the apartment as deregulated in 2005 and discontinued rent registrations with DHCR, it did so based on a justifiable belief that the apartment was no longer subject to rent regulation and such filings were unnecessary. Preventing the owner from charging what is otherwise a legal rent, solely based on the lack of registration filings during the period before *Roberts* and *Gersten* were decided, would unfairly penalize the owner for action that was taken in good faith, relying upon DHCR's own interpretation of the law, without furthering any legitimate purpose of the rent stabilization laws (*see Dodd v 98 Riverside Dr., LLC*, 2012 NY Slip Op 31653[U] [Sup Ct, NY County 2012]).

DHCR also properly concluded that there was no basis to look beyond the four-year limitations period set forth in the Rent Stabilization Code (Rent Stabilization Code [RSC] [9 NYCRR] § 2522.3 [a]) to challenge the rent. The owner's amended (or late) filings did not toll or extend the time within which an FMRA could be filed. Ordinarily, when a rent-controlled apartment is vacated, it becomes subject to rent stabilization. At that time, the owner is free to charge an initial fair market rent that is "agreed to by the landlord and the tenant and reserved in a lease or provided for in a rental agreement." (RSL § 26-512 [b] [2].) That initial rent is then registered and an RR-1 notice is served on the tenant, triggering the tenant's right to challenge the rent by filing an FMRA with DHCR (RSC §§ 2521.1 [a] [1]; 2522.3). The FMRA is required to be filed no later than 90 days after the tenant is served with requisite notice of the initial legal regulated rent (*see Matter of Verbalis v New York State Div. of Hous. & Com-*

*munity Renewal*, 1 AD3d 101, 102 [1st Dept 2003]; *Matter of Muller v New York State Div. of Hous. & Community Renewal*, 263 AD2d 296, 302 [1st Dept 2000], *lv denied* 95 NY2d 763 [2000]).

If no notice is served, then the FMRA must be filed no later than four years after the time the rent-controlled unit is originally removed from the City's rent laws (RSC § 2522.3 [a], [b] [1], [2]). Moreover, examination of the rental history is limited to the four-year period preceding the filing of the complaint or petition (*Matter of Gilman v New York State Div. of Hous. & Community Renewal*, 99 NY2d 144, 149 [2002]). The right to file an FMRA generally belongs only to the first tenant to occupy the apartment after it becomes decontrolled (RSC § 2522.3 [a]). Under certain circumstances that right may pass on to the next tenant to occupy the apartment, if there is improper notice to the first tenant (*id.*; *Matter of McKenzie v Mirabal*, 155 AD2d 194, 201 [1st Dept 1990]), or there is evidence that the purported "notice" may have been fraudulent (*East W. Renovating Co. v New York State Div. of Hous. & Community Renewal*, 16 AD3d 166, 167 [1st Dept 2005] [ample record to show that the tenants neither signed nor received the notice]).

At bar, the apartment was originally removed from rent control in 2005. Any FMRA would have needed to have been filed, at the latest, in 2009 before petitioners took occupancy. DHCR rationally concluded that petitioners' FMRA, filed in 2012, was untimely. Because the four-year limitations period expired while Playfair was still the tenant, the right to file an FMRA could never have passed on to petitioners. Additionally, there is no legal authority supporting petitioners' argument that because the RR-1 notice was served after the four-year period, the limitations period was extended.

We recognize that under certain circumstances, especially where a landlord has engaged in fraud in initially setting the rent or in removing an apartment from rent regulation, the court may examine the rental history for an apartment beyond the four-year statutory period allowed by CPLR 213-a (*Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin.*, 15 NY3d 358, 366-367 [2010]; *Thornton v Baron*, 5 NY3d 175 [2005]). However, in this case, there is simply no evidence or indicia that the owner engaged in a fraudulent deregulation scheme to remove the apartment from the protections of the rent stabilization law (*Todres v W7879*,

*LLC*, 137 AD3d 597, 598 [1st Dept 2016], *lv denied* 28 NY3d 910 [2016]). DHCR properly concluded that the owner did not engage in fraud when it removed the apartment from rent regulation in 2005 because it was relying on DHCR's own contemporaneous interpretation of the relevant laws and regulations. Similarly, DHCR rationally concluded that there was no fraud in the owner's failure to re-register the apartment until 2012, when the issue of the retroactive application of *Roberts* became apparent. Nor may petitioners rely on their claim that the IAIs were fraudulent, because the owner sufficiently documented the apartment improvements in their response to the petition before the DHCR (*see 72A Realty Assoc. v Lucas*, 101 AD3d 401, 402-403 [1st Dept 2012]). Petitioners failed to raise a colorable claim of fraud warranting any further consideration of that issue by DHCR (*Matter of Boyd v New York State Div. of Hous. & Community Renewal*, 23 NY3d 999, 1000 [2014]). In any event, the bona fides of the IAIs were, for reasons previously stated, irrelevant to the issues presented in this FMRA. Petitioners' reliance on our decision in *Olsen v Stellar W. 110, LLC* (96 AD3d 440 [1st Dept 2012], *lv dismissed* 20 NY3d 1000 [2013]) is unavailing. *Olsen* was decided on the basis of primary jurisdiction of the DHCR. Apart from any other significant distinctions, this Court did not rule substantively on the fraud issue; we simply remanded it to DHCR for further investigation.

Accordingly, the judgment of the Supreme Court, New York County (Paul Wooten, J.), entered October 27, 2015, denying the petition to annul a final order of respondent DHCR, dated August 12, 2014, which denied the petition for administrative review and affirmed the order of the DHCR Rent Administrator, dated May 9, 2013, that dismissed petitioners' fair market rent appeal as time-barred and determined that the subject apartment became decontrolled on May 1, 2005, and dismissing the proceeding brought pursuant to CPLR article 78, should be affirmed, without costs.

ANDRIAS, J.P., FEINMAN and KAHN, JJ., concur.

Judgment, Supreme Court, New York County, entered October 27, 2015, affirmed, without costs.