Taylor v 72A Realty Assoc., L.P. (2017 NY Slip Op 04218)





Taylor v 72A Realty Assoc., L.P.


2017 NY Slip Op 04218


Decided on May 25, 2017


Appellate Division, First Department


Gische, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on May 25, 2017
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Peter Tom, J.P.
Rosalyn H. Richter
Judith J. Gische
Ellen Gesmer, JJ.


151560/14 2673 

[*1]James Taylor, et al., Plaintiffs-Respondents,
v
72A Realty Associates, L.P., et al., Defendants-Appellants.



Defendants appeal from the order of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered January 29, 2016, which, to the extent appealed from, denied their motion for summary judgment insofar as it sought dismissal of the complaint as against the Owner, and granted plaintiffs' cross motion for summary judgment declaring that apartment 5M is rent-stabilized.




Joel M. Zinberg, New York, and Murray Shactman, New York, for appellants.
Law Offices of Sokolski & Zekaria, P.C., New York (Daphna Zekaria of counsel), for respondents.



GISCHE, J.


There are interlocking complex issues framed by this appeal involving plaintiffs' claims that the apartment they have continuously rented for the last 16 years (apartment 5M), was improperly removed from rent stabilization. The overarching issue is whether the apartment should be restored to rent stabilization because defendant 72A Realty Associates L.P. (the Owner) deregulated the apartment pursuant to the luxury decontrol laws while it was simultaneously receiving tax incentives under the City's J-51 program [FN1] (see Administrative Code [*2]§ 11—243). There can be little dispute that following Roberts v Tishman Speyer Props., L.P., (13 NY3d 270 [2009]) and its progeny applying Roberts retroactively (Gersten v 56 7th Ave. LLC, 88 AD3d 189, 198 [1st Dept 2011]) the subject apartment must be returned to rent stabilization as of 2000, when the Owner first treated the apartment as exempt. The thornier issues implicated by returning the apartment to rent stabilization concern the setting of the stabilized rent, the base date for, and the statute of limitations applicable to, the setting of such rent, and the possible imposition of treble damages and attorney fees. We agree with Supreme Court that plaintiffs are entitled to a declaration that the apartment was and still is subject to rent stabilization and that they are the rent-stabilized tenants thereof. We also agree with Supreme Court that the issues of the legal rent, as well as the issues of possible overcharge, treble damages and attorneys fees cannot be resolved on a motion for summary judgment. We disagree with Supreme Court only insofar as it held that the increases made to the rent-stabilized rent in 2000, based upon individual apartment improvements (IAIs) before the plaintiffs took occupancy, are subject to challenge on this record.
Apartment 5M is a two bedroom apartment at 187 East 4th Street in Manhattan. Plaintiff Tamara Jenkins moved into the apartment in February 2000 upon signing a two-year vacancy lease at a monthly rent of $2,200 [FN2]. The lease consisted of an altered, standard, printed rent-stabilized lease. The words "RENT STABILIZATION" were crossed out in the heading of the lease as was the entirety of paragraph 32, pertaining to "[r]ent regulations." There was a separate rider that contained the following notice:
"39. Tenant acknowledges that he/she has been informed that the demised apartment is exempt from and not subject to any rent control or rent stabilization laws or regulations (e.g. the NYC Rent Stabilization Law and Code or the Emergency Tenant Protection Act). Paragraph 32 of the printed form of this lease is not applicable and is deemed deleted."[FN3]
Peter Zajonc occupied the apartment before Jenkins. Zajonc was the first rent-stabilized tenant of apartment 5M after it was removed from rent control in 1993. Zajonc filed a fair market rent appeal (FMRA) with DHCR challenging the initial rent-stabilized rent of $1,265 charged by the Owner. DHCR denied the FMRA. He continued to reside in the apartment until 1999 when he surrendered it. At that time Zajonc's rent was $1,464 per month, which was the [*3]legal rent registered with DHCR at that time.
Before Jenkins moved in and while the apartment was still vacant, the Owner undertook certain improvements to the apartment, including the installation of new thermal break windows; the demolition of walls and construction of a new closet in one bedroom; the removal and installation of new kitchen cabinets and countertops; the installation of new appliances, including a dishwasher and refrigerator; the installation of a new sink, faucet and floor in the kitchen; the refinishing of all doors; and the installation of new tiles around the plumbing work and new closet shelving. Janet Zinberg,[FN4] the current managing agent, provided business records she claims were maintained in the Owner's files by her now deceased father, the managing agent at the relevant time. The records include bills, statements and invoices from contractors, service providers and suppliers, either marked paid, or supported by cancelled checks proving payment. Ms. Zinberg contends the records support the Owner's claim that it spent $18,343.07 in improvements to the apartment before Jenkins moved in.
In setting the rent for the vacant apartment in 2000, the Owner sought to take advantage of two increases that were available to it under the rent regulation laws. One increase was simply due to the apartment becoming vacant; that increase, which was equal to 20% of the registered rent, was $292.80 [FN5]. The other increase was based upon an allowable percentage of the cost of IAIs made to the vacant apartment (Rent Stabilization Law of 1969 [Administrative Code] [RSL] § 26-511[c][13]; Rent Stabilization Code [9 NYCRR] [RSC] § 2522.4[a][1]). In this case 1/40th of the improvements, or the sum of $458.58, was added on to the registered rent ($1,464). The two increases, taken together, increased the rent to $2,215.38 per month.
Because the new rent for apartment 5M exceeded $2,000 per month, the Owner then decontrolled the apartment, returning it to the free market, on the basis that the permitted rent exceeded the high-rent/vacancy threshold for luxury decontrol (RSL § 26-504.2[a]). Despite the building's enrollment in the J-51 tax abatement program in 2000, the Owner believed it could rely on the luxury decontrol laws to return the apartment to the free market. This was consistent with DHCR's interpretation of the relevant laws and regulations at that time (Roberts, 13 NY3d at 281). The Owner's belief that it could rely on the luxury decontrol laws while simultaneously receiving J-51 benefits, however, proved to be erroneous for the reasons articulated in Roberts (13 NY3d at 286).
DHCR's registration records contain an entry, made in 2000, indicating that the apartment was "exempt" from registration. Although the entry indicates that the reason for the exemption is based upon the apartment being either a coop or condo, this is a clerical error; the exemption was based upon luxury decontrol. At or about the time Jenkins accepted the first lease, the Owner filed a rent registration form (an RR-2A) with DHCR, stating that apartment 5M was permanently exempt from annual rent registration due to "[h]igh [r]ent [v]acancy." The Owner's records show that a copy of this filing was mailed to Jenkins in August 2001. Jenkins did not challenge the rent increases at that time.
Plaintiffs have renewed their lease several times since taking occupancy. Their renewal lease for the period of March 2013 to February 2014 was at a rent of $3,783 per month. On November 22, 2013, 90 days before the lease was due to expire, the Owner offered plaintiffs a rent-stabilized renewal lease (RSC § 2523.5[a]). Plaintiffs signed a two-year renewal lease at a rent of $4,076.18 per month. On March 24, 2014, shortly after plaintiffs commenced this action, the Owner first filed annual rent registrations for years 2009 through 2013. Each of these filings lists a "legal regulated rent" that is higher than what the Owner charged under plaintiffs' renewal [*4]leases and the amounts plaintiffs were actually charged in rent are denominated "prefer[ential] rents]" (all capitalization omitted). The buildings's J-51 benefits have since expired.
Supreme Court correctly declared that plaintiffs are rent-stabilized tenants. Contrary to the Owner's argument, the fact that it has now offered plaintiffs a rent-stabilized lease, which only began in March 2014, does not render the issue of plaintiffs' rent-stabilized status moot. The declaration required in this case is retroactive to the inception of plaintiffs' tenancy and affects their rights from that point in time to the present.
Before the 2009 Court of Appeals decision in Roberts there was a widespread practice among owners of certain rent-stabilized buildings of taking simultaneous advantage of the luxury decontrol laws while also enrolled in and receiving J-51 tax benefits [FN6]. This practice was premised on DHCR's 1996 administrative interpretation of these laws. In deciding Roberts, the Court of Appeals rejected DHCR's interpretation, holding that apartments in buildings receiving J-51 benefits remain subject to rent stabilization for at least as long as the J-51 benefits are in force (see 28 RCNY 5-03[f]; Roberts, 13 NY3d at 286). The net result of Roberts is that any rent-stabilized apartment that was luxury deregulated while also receiving J-51 benefits was improperly deregulated. Roberts, however, expressly left open certain important issues, including whether its decision had retroactive effect and the statute of limitations applicable to the disputes (13 NY3d at 287). The Court of Appeals did not address what effect expiration of J-51 benefits would have on the rent-regulated status of affected apartments, or how to calculate the rent-stabilized rents for apartments that were improperly removed from rent regulation. Subsequent decisions by this Court, however, have now resolved some of these crucial issues and inform the decision in this case.
In 2011, this Court decided the issue of retroactivity, holding that Roberts has retroactive application because the Court of Appeals did not establish a new principle of law, it had only construed law that had been in effect for years (Gersten v 56 7th Ave., LLC, 88 AD3d 189, 198 [1st Dept 2011]). Although our decision in Gersten was appealed, the appeal was withdrawn in March 2012 (18 NY3d 954 [2012]), making it clear from that point forward that owners had an obligation to retroactively restore affected apartments to rent stabilization and register them (Matter of Park v New York State Div. of Hous. & Community Renewal, __ AD3d __ [1st Dept 2017], 2017 NY Slip Op 02745, *3-4 [1st Dept 2017]).
This Court has also decided the impact that subsequent expiration of J-51 benefits has on the availability of the luxury decontrol laws. We have held that an apartment that is subject to rent stabilization before receiving J-51 benefits reverts to its former pre-J-51 rent-stabilized status upon the expiration of those benefits (Matter of Bramwell v New York State Div. of Hous. and Community Renewal, 147 AD3d 556, 556 [1st Dept 2017], citing Matter of Schiffren v Lawlor, 101 AD3d 456, 457 [1st Dept 2012]). The reversion to pre-J-51 benefit rent regulation includes the right of an Owner to seek luxury decontrol in appropriate cases (Schiffren, 101 AD3d at 457). In 72A Realty Assoc. v Lucas (101 AD3d 401 [1st Dept 2012][Lucas]), however, a case involving this very same Owner and building, we recognized that a tenant in occupancy at the time an apartment was improperly deregulated by a landlord receiving J-51 benefits retains its rent-regulated status for the duration of its tenancy (id. at 401-402).
Roberts and Gersten make it clear that the Owner had no right to return apartment 5M to the free [*5]market in 2000 when it was first leased to Jenkins. Lucas compels the further result that even though the J-51 benefits have since expired, the apartment was improperly deregulated and remains rent-stabilized. Jenkins was the legal tenant of apartment 5M while the J-51 tax benefits were in effect and after they expired, plaintiffs continued to occupy the apartment. Because plaintiffs have continuously occupied the same apartment since the inception of Jenkins's tenancy in 2000, apartment 5M remains subject to rent stabilization.
The collateral issues raised by this appeal concern the setting of the rent-stabilized rent for the apartment, which implicates the applicable statute of limitations and look back period. The Owner argues that there is no basis to look beyond the four-year limitations period applicable to rent overcharge complaints, set forth in the Rent Stabilization Code (RSC § 2522.3[a]). Plaintiffs argue that the four-year limitations period should be disregarded and the entire rent history should be examined, including the Owner's charges for the IAIs it contends to have made in 2000, because such improvements may have been fraudulent.
In general, while the regulatory status of an apartment may be challenged at any time during a tenancy, challenges to the level of rent charged must be made within a four-year limitations period (CPLR 213-a; Gersten, 85 AD3d at 199). Moreover, examination of the rental history is usually limited to the four-year period immediately preceding the filing of a complaint or petition (Matter of Gilman v New York State Div. of Hous. & Community Renewal, 99 NY2d 144, 149 [2002]). At bar, four years before the instant action was filed was February 21, 2010. This date serves as the base date by which to calculate overcharges, if any.
We recognize that under certain circumstances, especially where a landlord has engaged in fraud in initially setting the rent or in removing an apartment from rent regulation, the court may examine the rental history for an apartment beyond the four-year statutory period allowed by CPLR 213-a (Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin., 15 NY3d 358, 367 [2010]; Thornton v Baron, 5 NY3d 175 [2005]). In this case, however, the Owner in its motion for summary judgment disproved any fraud in the setting of rent when Jenkins first took occupancy. Plaintiffs' assertions of possible fraud in connection with the apartment improvements made in 2000 are pure speculation and insufficient to create an issue of fact or warrant discovery (Matter of Boyd v New York State Div. of Hous. & Community Renewal, 23 NY3d 999 [2014]).
In moving for summary judgment the Owner provided documentation of the actual improvements [FN7]. It also proved that in 2000 these very plaintiffs were aware that the apartment had been removed from rent stabilization pursuant to luxury decontrol. The information was contained in their lease; they were provided with the required rent stabilization notice, further informing them that the apartment was now exempt from rent stabilization because of high-rent/vacancy decontrol, and the exempt status of the apartment was a matter of public record because it was on file with DHCR. The rent charged Zajonc, the previous tenant, was a matter of public record as well because the rent was registered with DHCR. Clearly, Jenkins knew the condition of the apartment when she first moved in 2000, and that year she had the right to contest the basis for the claimed increases in rent that brought it beyond the $2,000 per month threshold. Plaintiffs were aware of the facts that would have permitted them to mount a challenge to the rent at that time, which challenge could have been for fraud or even on a less onerous standard, for instance, the reasonableness of the costs attributable to the claimed improvements. Moreover, plaintiffs had every incentive to contest the level of rent charged when they first took occupancy, because any successful challenge to the IAIs in 2000 could have [*6]potentially brought the rent below the $2,000 luxury decontrol threshold, and the apartment would have remained rent-stabilized even without regard to any issues considered in Roberts.
In response to the Owner's prima facie showing that there was no fraud underlying the IAI rent increases in 2000, plaintiffs failed to raise any issue of fact requiring a trial or further discovery. Although plaintiffs originally alleged that the Owner had not made any improvements at all, but only minor repairs to the apartment, they now concede that the Owner may have installed "a few appliances and kitchen cabinets." They still contend, nonetheless, that they need further discovery regarding the condition of the apartment before the professed improvements were made so they can gauge the accuracy of the amount the Owner claims to have spent on them.
A mere allegation of fraud, alone, is insufficient to justify any further discovery (Conason v Megan Holding, LLC, 25 NY3d 1, 16 [2015], citing Matter of Grimm, 15 NY3d at 367) as it would defeat the salutary purpose of the four-year statute of limitations, which is to "alleviate the burden on honest landlords to retain rent records indefinitely" (Thornton, 5 NY3d at 181, citing Gilman, 99 NY2d at 149). As in Boyd (23 NY3d 999), plaintiffs have "failed to set forth sufficient indicia of fraud" in connection with improvements that were made more than a decade ago (id. at 1000-1001, citing Grimm, 15 NY3d at 366—367). Mere skepticism about the quality of the improvements or how extensive they were is insufficient to require any further inquiry, particularly where, as here, Jenkins was the first tenant to live in the apartment after the improvements were made. Despite having direct knowledge of the condition of the apartment, Jenkins fails to identify or contradict a single improvement the Owner claims it made. Moreover, she was given sufficient notice of the increases to the rent at or about the time she accepted the lease and moved in so as to trigger any rights she had at the time to contest the improvements.
Contrary to plaintiffs' arguments, the Owner's business records provided in this case are admissible under a hearsay exception and are properly considered on the Owner's motion for summary judgment (CPLR 4518[a]; DeLeon v Port Auth. of N.Y. and N.J., 306 AD2d 146 [1st Dept 2003]). By providing records that include itemized bills from contractors, and record of payment, such as cancelled checks, the Owner has produced sufficient information and detail to validate the 1/40th increase in the rent attributable to those improvements (compare Lucas at 402-403 [significant increase for improvements, but no records]; Altschuler v Jobman 478/480, 135 AD3d 439, 440 [1st Dept 2016] [affidavit provided, but no documentary proof of improvements], lv dismissed 28 NY3d 945 [2016], lv denied __ NY3d __, 2017 NY Slip Op 68891 [2017]).
Equally unavailing is plaintiffs' reliance on Jemrock Realty Co., LLC v Krugman (13 NY3d 924 [2010]) for their contention that discovery is required. Jemrock does not, as plaintiffs argue, mandate that a hearing must be held each and every time a tenant challenges improvements. Jemrock actually clarifies that there is no inflexible rule of proof or requirement that a landlord provide an item-by-item breakdown of the improvements it made (id. at 926). What is required is that the fact-finder review the record and render the judgment that is warranted by the facts (id.). Plaintiffs do not provide any basis for their claim that further discovery will lead to additional relevant evidence on the issue of fraud (see Nascimento v Bridgehampton Constr. Corp., 86 AD3d 189, 192 [1st Dept 2011]). Since we have decided that the increases in rent attributable to the vacancy and improvements were legally permissible, it follows that the Owner was justified in raising the rent by the designated percentage of those amounts at the inception of Jenkins's tenancy. The rent in 2000, with permissible increases could have been $2,215.38, a sum that is more than what Jenkins was actually charged for rent in the initial vacancy lease made as of February 2000. The initial rent, which exceeded $2,000 per month, was still permissible even though the apartment was still subject to rent stabilization. We have previously recognized that a rent-stabilized tenant in a building receiving J-51 benefits can be charged rent in excess of the vacancy threshold, while still retaining the other benefits of stabilization, including the right to renewal leases and capped increases (Matter of Park v New York State Div. of Hous. & Community Renewal, __ AD3d __, 2017 NY Slip Op. 02745, *4 [1st [*7]Dept 2017]).
While there is no evidence of fraud by the Owner in setting plaintiffs' initial rent in 2000, and the base date for setting the rent is February 21, 2010 (cf Grimm, 15 NY3d 358), the Owner's motion for summary judgment was properly denied. The Owner is still required to prove what the legally regulated rent was on the base date (Grimm at 365, citing 9 NYCRR 2520.6[e], [f][1]; 2526.1[a][3][i]). At bar, the Owner simply claims that because it charged plaintiffs $3,500 a month in rent pursuant to a lease and it later registered that rent with DHCR, that amount should be accepted as the legal, regulated rent for the apartment and used by the court to decide plaintiffs' overcharge claims. We know, however, that the rent set in that lease was based on the Owner's misapprehension that apartment 5M was not subject to rent stabilization. Although the Owner could charge plaintiffs a rent greater than $2,000 per month in 2000, this did not withdraw the apartment from rent stabilization; it remained rent-stabilized despite a rent in excess of $2,000. This was due to the fact that the same tenants (plaintiffs) remained in occupancy throughout the relevant time. Rent stabilization, at a minimum, entitled plaintiffs to renewal leases at capped increases in rent (Park at *4). There is no evidence in this record that the rent Owner charged thereafter was limited to lawful rent guidelines increases rather than fair market, unregulated rent. We cannot reconcile a mechanical application of CPLR 213-a and give effect to the retroactive application of Roberts, as we must (Gersten, 88 AD3d at 198), without considering the permitted rent stabilization increases after the expiration of the 2000 lease and preceding February 21, 2010. Only in this manner can it be determined whether the rent the Owner charged plaintiffs on the base date bears any relation to a permissible, rent-stabilized rent. In other words, a contrary ruling would essentially allow the Owner to collect rent that might be in excess of what it could have otherwise charged plaintiffs, based upon its own misapprehension of the law (id.). Therefore, a determination of the legally permissible rent-stabilized rent that plaintiffs should have been charged on the base date requires a mathematical calculation of the applicable rent guidelines (and any other) legally permissible increases since February 2002, the expiration date of the first lease.
Although the Owner filed retroactive DHCR registrations in 2014, these registrations do not establish that the 2010 rent it charged plaintiffs was in accordance with the applicable rent stabilization guidelines. These registrations were filed less than four years before the filing of plaintiffs' complaint and they are only retroactive to 2009. They do not address the period of time after Jenkins's initial lease through 2009. Thus, they are subject to dispute. We have recognized that in a Roberts situation where an Owner had discontinued DHCR rent registrations based upon a justifiable belief that the apartment was not subject to rent regulation, it should not be penalized by rolling the rent back to the last registered rent (Park at *4 citing Jazilek v Abart Holdings, LLC, 72 AD3d 529, 531 [1st Dept 2010]). However, on the other hand, an Owner cannot use the lack of registration or misapprehension of the law as a sword to establish a rent that clearly bears no relation to the appropriate parameters of rent regulation.
The timing of these retroactive registrations may play a role in this case on the issue of willfulness. We have recognized that at least by March 2012 the law clearly required the retroactive return of apartments like these to rent regulation (Park at *3-4). In the Lucas decision involving this very Owner and the same building (101 AD3d 401 [1st Dept 2012]), we made it clear that an improperly deregulated apartment was required to be returned to rent stabilization and that the base date rent should not have been set at the market rate (id. at 402). The Owner here failed to register apartment 5M and readjust the rent until 2014 when faced with this litigation. These facts preclude any determination at this time about whether an overcharge, if any, was willful, and the Owner should be allowed the opportunity to explain the reasons for such delay and the steps, if any, it undertook to bring itself in compliance. Legal fees also cannot be determined without the underlying issues of overcharge and penalty being decided.
Accordingly, the order of the Supreme Court, New York County (Jennifer G. Schecter, J.), entered January 29, 2016, which, to the extent appealed from, denied defendants' motion for summary judgment insofar as it sought dismissal of the complaint as against the Owner, and [*8]granted plaintiffs' cross motion for summary judgment declaring that apartment 5M is rent-stabilized, should be modified, on the law, solely to declare that the increases made to the rent-stabilized rent in 2000, based upon IAIs before plaintiffs took occupancy, were legally permissible, and otherwise affirmed, without costs.
All concur.
Order, Supreme Court, New York County (Jennifer G. Schecter, J.), entered January 29, 2016, modified, on the law, solely to declare that the increases made to the rent-stabilized rent in 2000, based upon IAIs before plaintiffs took occupancy, were legally permissible, and otherwise affirmed, without costs.
Opinion by Gische, J. All concur.
Tom, J.P., Richter, Gische, Gesmer, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MAY 25, 2017
CLERK



Footnotes

Footnote 1: In New York City, multiple dwellings may qualify for tax incentives designed to encourage rehabilitation and improvements (see Administrative Code of City of NY § 11-243 [previously § J51-2.5]). The City's J-51 program, authorized by Real Property Tax Law § 489, allows property Owners who complete eligible projects to receive tax exemptions and/or abatements that continue for a period of years (see Admin Code § 11-243[b][2], [3], [8]; 28 RCNY 5-03[a]). Rental units in buildings receiving these exemptions and/or abatements must be registered with the Division of Housing Community Renewal (DHCR), and are generally subject to rent stabilization for at least as long as the J-51 benefits are in force (see 28 RCNY at 5-03[f]).

Footnote 2: Plaintiff James Taylor moved in later on and was added to the lease. Jenkins and Taylor are collectively referred to as plaintiffs in this opinion.

Footnote 3: The lease did not contain any notice that upon expiration of the J-51 benefits the Owner would seek to have the legal status of the apartment changed (see Gersten, 88 AD3d at 194-195, citing East W. Renovating Co. v New York State Div. of Hous. & Community Renewal, 16 AD3d 166 [1st Dept 2005] and Matter of Lomagno v Division of Hous. & Community Renewal, 38 AD3d 897 [2d Dept 2007]). The Owner believed at the time that the apartment was exempt from rent stabilization, which, if true, would have rendered any such provision meaningless. 

Footnote 4: She was dismissed from the case as an individual defendant.

Footnote 5: There has never been any claim by plaintiffs that the vacancy increase charged by the Owner at the inception of their tenancy was impermissible.

Footnote 6: DHCR's interpretation distinguished between those owners of buildings that were rent-regulated before receiving such tax benefits from those owners whose buildings became regulated "solely" due to receiving such benefits. That distinction meant that owners of already regulated buildings could take advantage of high-rent/luxury decontrol, but not owners whose buildings were regulated "solely" as a result of receiving those benefits (see Roberts, 13 NY3d at 286).

Footnote 7: In this regard we distinguish our earlier decision in Lucas (101 AD3d 401), although it involved the same Owner and building, but a different tenant. In Lucas, the Owner failed to support its claimed apartment renovations with sufficient documentary evidence (id. at 402-403).